Patrick J. O'HANLON, Individually and as Administrator of the Estate of Brian O'Hanlon, Plaintiff,

v.

HARTFORD ACCIDENT AND INDEMNITY COMPANY, a Connecticut corporation, et al., Defendants.

Civ. A. No. 76–59.

United States District Court, D. Delaware.

Aug. 21, 1981.

David Roeberg, Frederick T. Haase, Jr., Roeberg & Associates, Wilmington, Del., for plaintiff.

F. Alton Tybout, Tybout, Redfearn, Casarino & Pell, Wilmington, Del., for defendant INA.

## OPINION

STAPLETON, District Judge.

The Court is called upon to reconsider the liability of the Insurance Company of North America ("INA") to Patrick J. O'Hanlon, individually and as the Administrator of the Estate of his son, Brian O'Hanlon. Brian O'Hanlon died in 1976 as a result of injuries sustained in an automobile accident in 1974.[1] Brian O'Hanlon was riding in a car owned and driven by Michael Ryan. The driver of the vehicle which apparently forced Ryan's car into a roadside collision has never been identified. Patrick O'Hanlon filed this diversity action to recover under uninsured motorist policies issued by INA, Hartford Accident and Indemnity Company, and Nationwide Mutual Insurance Company. The claims against Nationwide and Hartford have been settled. INA has also paid $35,000 under the "XIM" excess insurance policy issued to Patrick

---

1. The pertinent facts are more fully set out in my previous opinion in this case, published at 439 F.Supp. 377 (1977).

O'Hanlon and $10,000, as directed by the Court of Appeals, under its CAL policy.

Plaintiff moves for partial summary judgment on his claim that the CAL policy must be reformed to include uninsured motorist protection of $100,000 per person, $300,000 per accident, in place of the $10,000 coverage it now provides. Defendant's cross motion for summary judgment rests on three grounds. First, INA asserts that the CAL policy should not be reformed unless plaintiff establishes, after a hearing, that he would have accepted this optional insurance coverage had it been offered. Second, defendant argues that the "Limits of Liability" provision of the insurance contract must be read to deduct payments under other uninsured motorist policies from any liability owing under the CAL policy. Since a total of $130,500 in such payments have already been made, INA has no additional liability. As its third legal argument, defendant asserts that the amount of damages recoverable under the CAL policy is deemed by the "Other Insurance" section of the contract to be the greatest coverage provided by a single applicable insurance policy. Liability is apportioned among the carriers according to its pro rata share of the sum of all applicable coverage. Thus, INA maintains, its share of liability, even if the contract is reformed to extend coverage of $100,000, is only 54% of the total. Accordingly, under this theory, its maximum liability would be $54,000.

## I

INA issued the "CAL" policy to Coe Management Co., a trade name under which Patrick O'Hanlon conducts his business.

Although the only vehicle covered by the CAL policy at the time of Brian O'Hanlon's accident was a truck used exclusively for Coe Management business, the Third Circuit has held that Patrick O'Hanlon is the "named insured"[2] as Coe's alter ego, and that accordingly the CAL policy covers Brian O'Hanlon as a member of Plaintiff's household.

As written, the CAL policy did not provide any uninsured motorist ("UM") coverage; nor was any offered to O'Hanlon. Following the accident, INA modified the policy to include the $10,000 per person, $20,000 per accident coverage mandated by law.[3]

■ INA has already paid $10,000 to the Plaintiff. At issue here are its additional obligations under the following provisions of 18 *Del.C.* § 3902(b):

> (b) . . . . Each insured shall be offered the option to purchase additional [uninsured motorist] coverage for personal injury or death up to a limit of $300,000, but not to exceed the limits for personal injury set forth in the basic policy.

Given the conceded absence of an offer of optional UM coverage, O'Hanlon has moved for summary judgment on his claim that his policy should be reformed to include such coverage. In response, INA contends that the breach of its statutory duty to offer optional UM coverage does not entitle the Plaintiff to reformation of the contract unless he can show that he would have purchased the additional coverage had it been offered originally. INA relies upon evidence which at least creates a genuine issue of material fact as to whether Plaintiff

2. 639 F.2d 1019, 1024 (3d Cir. 1981).

3. 18 *Del.C.* § 3902 provides in part:

(a) No policy insuring against liability arising out of the ownership, maintenance or use of any motor vehicle shall be delivered or issued with respect to any vehicle registered or principally garaged in this State unless coverage is provided therein or supplemental thereto for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured or hit-and-run motor vehicles for bodily injury, sickness or disease, including death, or personal property damage resulting from the ownership, maintenance or use of such uninsured or hit-and-run motor vehicle. Except, that no such coverage shall be required in or supplemental to a policy where rejected in writing, on a form furnished by the insurer describing the coverage being rejected, by the insured named therein, or upon any renewal of such policy unless the coverage is then requested by the named insured. The coverage herein required may be referred to an "uninsured motorist coverage."

would have accepted the optional uninsured motorist coverage, had it been offered to him.[4]

In this diversity case, the task of the Court is to divine as best it can, what rule the Supreme Court of Delaware would adopt regarding the remedy for the breach of an insurer's obligation under Section 3902(b). *Wilmington Supply Co. v. Worth Plumbing and Heating*, 505 F.Supp. 777, 779 (D.Del.1980). Since my earlier opinion in this case, Vice-Chancellor Hartnett has provided me valuable guidance in this enterprise. His decision in *Schwartz v. Centennial Insurance Co.*, C.A. 5350, 1977, unreported op. (Del.Ch. April 1, 1981), makes several things clear. Section 3902(b) imposes an affirmative duty on every automobile liability insurer to offer UM coverage, and, when liability coverage is issued in violation of that statute, the insured is entitled under Delaware law to have his policy reformed to include the additional UM coverage. Moreover, this remedy exists at any time after the issuance of the policy and continues even after an accident occurs. Finally, and most importantly for present purposes, the *Schwartz* case rejects the argument that a right to such reformation should not be held to arise under Delaware law because § 3902(b) mandates only an offer of coverage and not the issuance of coverage.

In *Schwartz*, the Vice-Chancellor summarized the defendants' argument as follows:

> Defendants contend that since the insured was not required to accept the increased coverage and could, in fact, have rejected it had it been offered, to reform the policy to "read in" the additional . . . coverage, would be to ignore the optional character of Section 3902(b). They, therefore, argue that this court cannot reform the contract to "read in" these amounts in the same was as it could for mandated coverage.

The Court then found that the "optional character" of Section 3902(b) did not preclude reformation at the election of the insured:

> [That section] places the burden of offering the coverage upon the insurer and the burden of persuasion rests upon it to show that the coverage was offered and refused. To hold otherwise would be to ignore the plain meaning of the statute; that is, it gives the insured the option to purchase additional coverage if he so desires.

Implicit in the *Schwartz* analysis of Delaware law is the view that an offending insurer, in legal effect, leaves a continuing offer of additional UM coverage outstanding unless and until it complies with the statute. This view is supported by the legislative objectives of Section 3902 and I predict that it will be accepted by the Supreme Court of Delaware.

In enacting Section 3902(b), the Delaware General Assembly sought to assure that every motorist would have a right to contract for UM coverage in an amount equal to his or her liability coverage or $300,000 whichever was less. Beyond this, however, it also sought to assure that each motorist *would be advised* of this right so he or she can make an informed choice and contract for higher coverage if he or she desires it. When an insurer breaches its duty under the statute, it deprives the insured of the opportunity to engage in the informed decision making process intended by the legislature. In this context, it seems appropriate to insist that the option of taking the additional UM coverage remain open until the insurer affords the intended opportunity for informed decision making.

If defendant's arguments were accepted, the insurer's default would deprive the insured of his or her right to know and de-

---

4. Donald Smith, the agent who sold the CAL policy to O'Hanlon, testified:

> . . . [W]hen [O'Hanlon] bought that policy he asked for Delaware no-fault coverage, and knowing the situation the way I did, that particular automobile was to be used by Mr. Updike to go from store to store . . . And Mr. Updike or any employee who would ride in the car would be covered by workmen's compensation. So I see no reason for more than the basic limits. If he asked me, that's what I would have recommended. (Smith Dep. at 40).

See also, *id.* at 41.

cide, and replace it with the right to have a fact finder later speculate about how the contemplated decision making process would have come out.[5] I doubt that the General Assembly intended the insurer's default to occasion a substitution so adverse to the interests of the intended beneficiaries of Section 3902(b).

Since it is undisputed that INA did not offer optional UM coverage to Patrick O'Hanlon, I conclude that he may exercise his continuing right to reformation of the contract to include such coverage.

## II.

■ The second matter presented for consideration is the meaning of the "limits of liability" clause in the CAL policy.[6] Previously it appeared undisputed:

that if valid, [this] clause [has] the following effect[ ]: (1) recovery under the uninsured motorist coverage is reduced by any amounts paid by the parties jointly or severally liable for the injuries, including sums paid under Ryan's liability insurance.

439 F.Supp. at 382. Defendant now argues that payments to O'Hanlon under other UM policies should also be applied against its contractual liability. I do not agree.

I find no support for INA's position either in the language of the policy, nor in case law. *See Mid-Central Mutual Casualty Co. v. Spanjer*, 101 Ill.App.2d 468, 243 N.E.2d 452, 454 (1968). The language of clause (ii), "any other person or organiza-

tion jointly or severally liable," as Defendant notes, ties into the policy's Trust Agreement. The Trust Agreement section states:

In the event of payment to any person under this insurance

(a) the Company shall be entitled to the extent of such payment to the proceeds of any settlement or judgment that may result from the exercise of any rights of recovery of such person against any person or organization legally responsible for the bodily injury or property damage because of which such payment is made; . . . .

Both the Trust Agreement and the Limits of Liability clause, read together, establish the insurer's right of subrogation against persons liable to the insured under traditional tort concepts of joint and several liability, and permits the insurer to recover payments made by a principal or agent, as well as the owner or operator of the vehicle, or other persons legally responsible for the injury. It simply stretches this language beyond the point of disintegration to extend it to contractual liability to pay uninsured motorist coverage in favor of the insured. Defendant's Motion for Summary Judgment on this ground is denied.

## III.

■ Defendant's second basis for summary judgment, although this only in part, is that the "other insurance" provision of the CAL policy limits plaintiff's practical recovery to either $39,897 or $16,695.[7] The "other insurance" section reads:

---

5. *See Lumbermens Mutual Casualty Co. v. Carriere*, 170 N.J.Super. 437, 406 A.2d 994 (1979) in which the court rejected the insurer's request for "supplemental fact-finding as to whether [the insured] would have opted for the coverage." *Id.* 406 A.2d note 3 at 1001. In *Holman v. All Nation Insurance Co.*, 288 N.W.2d 244 (Minn.1980), the court found that the insurer had failed to prove an offer was made; it therefore disregarded the fact that Holman "wanted to spend as little as possible for his policy of insurance." *Id.* at 250, and might not have accepted the additional insurance if it had been offered.

6. This reads, in pertinent part:
    Any amount payable under the terms of this insurance because of bodily injury or

property damage sustained in an accident by a person who is insured shall be reduced by:
    (1) All sums paid on account of such bodily injury or property damage by or in behalf of . . . .
    (i) the owner or operator of such uninsured highway vehicle and
    (ii) any other person or organization jointly or severally liable together with such owner or operator for such bodily injury or property damage.

7. INA bases the latter figure on its pro-rata share of the total available insurance pool if the Hartford policies are deemed reformed to provide a total of $360,000 in additional coverage. Since those policies have not been reformed,

With respect to bodily injury to an Insured while occupying a highway vehicle not owned by the Named Insured, this insurance shall apply only as excess insurance over any other similar insurance available to such Insured and applicable to such vehicle as primary insurance, and this insurance shall then apply only in the amount by which the limit of liability for this coverage exceeds the applicable limit of liability of such other insurance.

Except as provided in the foregoing paragraph, if the Insured has other similar insurance available to him and applicable to the accident, the damages shall be deemed not to exceed the higher of the applicable limits of liability of this insurance and such other insurance, and the Company shall not be liable for a greater proportion of any loss to which this coverage applies than the limit of liability hereunder bears to the sum of the applicable limits of liability of this insurance and such other insurance.

With respect to property damage, the insurance hereunder shall apply only as excess insurance over any other valid and collectible insurance of any kind applicable to such property damage, and this insurance shall apply only in the amount by which the limit of liability for this coverage exceeds the amount recoverable under such other insurance.

Again, the language of the policy is straightforward.[8] "Except as provided in the foregoing paragraph," indicates that where both a primary policy and several other policies are applicable, that liability is apportioned first by reference to ¶ 1, and then by pro-rata distribution among the

secondary insurers. These paragraphs are not mutually exclusive in effect, despite plaintiff's tortured efforts to construe them that way.

They are mutually exclusive in effect only when a primary and single secondary coverage are involved.[9] *See Keeble v. Allstate Insurance Co.*, 342 F.Supp. 963 (E.D. Tenn.1971); *McClure v. Employers Mutual Casualty Co.*, 238 N.W.2d 321 (Iowa 1976); *Jones v. Morrison*, 284 F.Supp. 1016 (W.D. Ark.1968). But where there are multiple carriers, the logical process has two steps. *See State Farm v. United Service Automobile Assn.*, 211 Va. 133, 176 S.E.2d 327 (1970).[10]

In this case, the primary insurance applicable to Brian O'Hanlon's injuries is that of Michael Ryan. Nationwide has paid $7,500 on that policy, against a policy limit of $10,000. Since the other insurance provision refers to limits of liability, INA's maximum exposure can be no greater than $90,000.

Next we calculate Plaintiff's damages, as they are deemed under paragraph 2. Hartford paid $78,000 on its UM coverages, but again, the policy refers to limits of liability. Accordingly, Hartford's limit amounts to $40,000. INA owed and paid $35,000 under the XIM policy. I calculate the damages recoverable against the "other insurance" provision to total $165,000.[11] INA's share of this total under the CAL policy is 54.5%. Its liability, therefore, is 54.5% of $90,000, or $49,050. From this figure I deduct the $10,000 already paid.

I will, therefore, grant partial summary judgment to Defendant, limiting its obligation to Plaintiff to $39,050.

---

and the issue is not before the Court, I find no reason to use this calculation.

**8.** Even if it were not, "It is settled that any ambiguity or contradiction in an insurance policy *must* be construed against the insurer, and in a manner which is more favorable to coverage." *Buntin v. Continental Insurance Co.*, 583 F.2d 1201, 1207 (3d Cir. 1978).

**9.** Paragraph 1 describes a limit to liability, while paragraph 2 refers to damages. The language is complimentary rather than contradictory.

**10.** *See also*, 439 F.Supp. at 382.

**11.**

| | |
|---|---|
| Hartford's liability limit is | $ 40,000 |
| INA's XIM policy limit is | $ 35,000 |
| As modified by § I above, INA's CAL policy limit is | $ 90,000 |
| | $ 165,000 |

## CONCLUSION

For the reasons I have set forth above, I will grant Plaintiff's Motion for Partial Summary Judgment, as well as Defendants' Motion limiting its liability under the reformed policy to $39,050.