**HOME INSURANCE COMPANY, the Home Insurance Companies and the Home Indemnity Company, Defendants and Third Party Plaintiffs Below-Appellants,**

v.

**Esteban MALDONADO, Third Party Defendant Below-Appellee.**

Supreme Court of Delaware.

Submitted: April 29, 1986.
Decided: Sept. 30, 1986.

Anne L. Naczi (argued) and Richard W. Pell of Tybout, Redfearn, Casarino & Pell, Wilmington, for appellants.

Michael P. Kelly (argued) and Wayne N. Elliott of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for appellee.

Frederick T. Haase, Jr., amicus curiae, Delaware Trial Lawyers Assn, Wilmington, for appellee.

Before HORSEY, MOORE and WALSH, JJ.

HORSEY, Justice:

This appeal presents the question of whether a motor vehicle tortfeasor who carries the minimum required third-party liability coverage nevertheless becomes liable by operation of law to the tort claimant's carrier to the extent of its underinsured coverage payments made to its insured.

Home Insurance Company ("Home") appeals from a summary judgment Order of the Superior Court barring its subrogation claim against the third-party tortfeasor, Esteban Maldonado ("Maldonado"). The suit arises out of an action filed by Sylvester Jenifer and his wife ("the Jenifers") against their carrier, Home,[1] for recovery of underinsured motorist benefits. Home, thereafter, filed a third-party complaint against Maldonado on the grounds that he was negligent and the sole cause of the Jenifers' injuries.

The issue presented is whether 18 *Del.C.* § 3902(a)(4) insulates a tortfeasor who carries minimum liability insurance in compliance with the Delaware Financial Responsibility Law[2] from liability through subrogation to the tort claimant's carrier for underinsured motorist coverage benefits paid to a non-negligent insured. The Superior Court found "no indication that the Legislature intended [such bar or] that

---

1. In addition to Home Insurance Company, the Home Insurance Companies and The Home Indemnity Company were also named as defendants. We will collectively refer to all three entities as "Home."

2. At the time of the Jenifers' accident, Delaware's Motor Vehicle Safety-Responsibility Law, 21 *Del.C.* § 2902, mandated that every automobile liability policy issued in the State provide coverage of $10,000 per person, $20,000 per accident. Effective January 19, 1984, the Legislature amended section 2902 to require minimum limits of $15,000 per person, $30,000 per accident. *See* 21 *Del.C.* § 2902; 64 *Del. Laws,* c. 198, § 1.

the provisio limitation [of section 3902(a)(4)] would apply to the underinsured." The Court ruled, however, that based upon grounds of public policy, recovery against an underinsured motorist was limited to the amount of insurance coverage required by the uninsured motorist Financial Responsibility Law. Although we disagree with the Superior Court's construction of section 3902, we agree with the judgment and, therefore, affirm, but upon a different rationale—legislative intent.

## I

The facts are not in dispute. On December 23, 1982, the Jenifers and Maldonado were involved in an automobile accident in New Castle County. The Jenifers subsequently brought suit against Maldonado for their personal injuries sustained in the accident. This action was settled when Maldonado's insurance carrier paid the $25,000 maximum limit of his $25,000 per person, $50,000 per accident ("25/50") automobile liability coverage to the Jenifers.[3] In exchange for the $25,000 settlement, the Jenifers signed a general release on March 7, 1984. The release provided that Maldonado would be released and forever discharged from "any and all claims, demands, damages, actions, causes of action or suits of any kind ... which have resulted or may in the future develop from an accident which occurred on or about the 23rd of December 1982...." The release, however, specified that the Jenifers' claims against Home for personal injury protection ("PIP") and underinsured motorist benefits would be preserved.

In April 1984, the Jenifers filed suit against Home, their PIP and underinsured motorist carrier, for recovery of underinsured motorist benefits. At the time of the accident the Jenifers had a 100/300 liability policy and underinsured motorist coverage with limits of 25/50. The Jenifers alleged that the underinsured motorist insurance available to them should have been equal to $100,000 because Home had failed to inform them that they could buy excess underinsured motorist coverage up to the lesser of $300,000 or the limits of their liability coverage as required by 18 Del.C. § 3902(b).[4] Thus, the Jenifers claimed Home should pay them $75,000, which represented the $100,000 limit of their liability coverage minus the $25,000 they had already received from Maldonado's insurance carrier.[5]

With its answer to the Jenifers' complaint, Home filed a third-party complaint for subrogation against Maldonado on the grounds that he was negligent and the sole cause of the Jenifers' injuries. Denying liability, Maldonado raised as an affirmative defense section 3902(a)(4) as insulating him from further liability and was granted

---

**3.** Hereinafter, coverage limits will be denoted by the thousands of dollars, e.g., 10 for $10,000; 300 for $300,000; and coverage will be listed per person/per accident. Hence, $100,000 per person, $300,000 per accident will be identified as "100/300."

**4.** Section 3902 [hereafter quoted in full in Section III] had been rewritten by 63 Del.Laws, c. 243, enacted May 20, 1982, effective ninety days later, or four months before this accident. Subparagraph (b) of section 3902 provided:

(b) Every insurer shall offer to the insured the option to purchase additional coverage for personal injury or death up to a limit of $300,000 but not to exceed the limits for personal injury set forth in the basic policy. Such additional insurance shall be underinsured coverage.

(underlining added for emphasis).

For other cases in which the insurance carrier failed to offer its insureds additional coverage, see, e.g., Whaley v. Allstate Insurance Co., D.Del., 595 F.Supp. 1023 (1984); O'Hanlon v. Hartford Accident & Indemnity Co., D.Del., 522 F.Supp. 332 (1981), aff'd without opinion, 3d Cir., 681 F.2d 807 (1982); State Farm Mutual Automobile Insurance Co. v. Arms, Del.Supr., 477 A.2d 1060 (1984).

**5.** Home apparently agreed that it failed to comply with section 3902(b) and revised the Jenifers' policy to have 100/300 underinsured motorist coverage. Thus, Maldonado then became an underinsured motorist because his 25/50 coverage was less than the Jenifers' revised 100/300 underinsured motorist limit.

summary judgment.[6] The Superior Court based its ruling on public policy.

## II

On appeal, Home asserts two interrelated arguments, which we will address simultaneously in our analysis. Home argues (1) that there is no statutory mandate prohibiting an underinsurance carrier from pursuing its legal remedies against the tortfeasor; and (2) that Maldonado is subject to further liability because section 3902(a)(4) only applies to uninsured motorist coverage and not to underinsured motorist coverage.

Maldonado responds with alternate arguments. *First,* assuming there is no statutory prohibition or limitation on the subrogation of underinsured motorist carriers, the Jenifers' earlier release of Maldonado bars Home from acquiring a viable subrogation claim against Maldonado. *See Tyre v. Andrews,* Del.Supr., 104 A.2d 775 (1954). *Second,* Maldonado argues that the subrogation limitation of section 3902(a)(4) applicable to uninsured motorist coverage applies equally to underinsured motorist coverage, thus insulating him from further liability. We find the second argument persuasive.

## III

The Delaware Legislature enacted the first uninsured motorist statute in 1968. *See* 56 *Del.Laws,* c. 380, § 3902. The statute required that all Delaware automobile insurance policies contain uninsured motorist coverage equal to the amount of coverage established in the Delaware Financial Responsibility Law, unless the named insured rejected uninsured motorist coverage in writing. *Id.* In 1971, however, the Legislature amended section 3902(b) to require every insurer writing a Delaware automobile insurance policy to offer its insureds the option to purchase "additional coverage" for personal injury or death up to a limit of $300,000. 58 *Del.Laws,* c. 98, § 2. Similarly, in 1971, the Legislature made automobile liability insurance compulsory on any motor vehicle registered in Delaware. 58 *Del.Laws,* c. 98, § 1. Thus, by (1) eliminating uninsured Delaware motorists and (2) compelling carriers to offer their insureds additional uninsured motorist coverage, the Legislature sought to decrease the risk of loss to innocent motorists.

The 1971 amendments, however, created an anomalous result which this Court recognized in *State Farm Mutual Auto Insurance Co. v. Hallowell,* Del.Supr., 426 A.2d 822, 827 (1981). In *Hallowell,* the insured, Mr. Hallowell, was injured by a tortfeasor with 20/40 liability coverage.[7] He then sought benefits under *his* 100/300 uninsured motorist policy because his damages exceeded the limits of the tortfeasor's liability policy. The Superior Court held that the tortfeasor's automobile was an uninsured motor vehicle because the coverage was less than the amount of uninsured motorist coverage that Hallowell purchased pursuant to the "additional coverage" amendment to section 3902(b). On appeal, we reversed. Finding section 3902 to be unambiguous, we held that the then-uninsured motorist statutory coverage provided protection only when the tortfeasor was either uninsured or carried liability insurance in amounts less than the statutory minimum. *Id.* at 826. Therefore, Hallowell could not recover benefits from the uninsured motorist provision of his policy. *Id.*

Thus, if an insured who had purchased additional uninsured motorist coverage was injured in an accident with an uninsured

---

6. Before Home filed its answer to Maldonado's motion for summary judgment, the Jenifers settled their claim for underinsured motorist benefits against Home for $25,000. Therefore, the only issues remaining before the Superior Court were (1) Home's third-party complaint for sub-

rogation against Maldonado; and (2) Maldonado's motion for summary judgment.

7. At the time of Hallowell's accident, section 2902 mandated that every policy issued in Delaware provide coverage of 10/20.

motorist, the insured's additional coverage was available to compensate him for his losses, up to his uninsured motorist coverage limit. If, however, the insured who had purchased additional uninsured motorist coverage was injured in an accident with a motorist who had the minimum amount of personal injury liability insurance required by section 2902, the insured could not collect uninsured motorist benefits from his carrier. We explicitly recognized this illogical and unfair result and urged the General Assembly to amend the statute.[8]

In 1982, the Legislature amended section 3902 by striking the entire section and replacing it with a new section 3902. *See* 63 *Del.Laws*, c. 243. This new version of section 3902, which was in effect at the time of the Jenifers' accident and applicable to this case, reads as follows:

§ 3902. Uninsured Vehicle Coverage; Insolvency of Insurer

(a) No policy insuring against liability arising out of the ownership, maintenance or use of any motor vehicle shall be delivered or issued for delivery in this State with respect to any such vehicle registered or principally garaged in this State unless coverage is provided therein or supplemental thereto for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured or hit and run vehicles for bodily injury, sickness, disease, including death, or personal property damage resulting from the ownership, maintenance or use of such uninsured or hit and run motor vehicle.

(1) No such coverage shall be required in or supplemental to a policy where rejected in writing on a form furnished by the insurer describing the coverage being rejected, by an insured named therein, or upon any renewal of such policy, unless the coverage is then requested in writing by the named insured, the coverage herein required may be referred to as uninsured vehicle coverage.

(2) The amount of coverage to be so provided shall not be less than the minimum limits for bodily injury, death and property damage liability insurance provided for under the motorist financial responsibility laws of this State. The coverage for property damage shall be subject to a $250 deductible for property damage arising out of one accident, unless the insured and the insurer agree in writing to a different deductible. As used herein, the term "property damage" shall include the loss of use of a vehicle.

(3) For the purposes of this section an uninsured vehicle shall be defined as:

a. One for which there is no auto liability bond, insurance, or other security applicable at the time of the accident in at least the amounts re-

---

**8.** Justice Duffy, speaking for the Court, stated the following:

We have given the Statute the meaning which is required, as we understand the law, but we certainly are not satisfied with the result. It appears that the General Assembly in making one needed reform did not contemplate a second area deserving remedial action. The effect of § 3902, as written, is to put an insured in a better position when he is injured by a tortfeasor carrying no automobile liability insurance than when he is injured by a tortfeasor carrying the mandatory minimum required by Statute. As the Superior Court made clear, that is an anomalous result. It is, at a minimum, poor public policy. And, for that reason, it should be changed promptly, but it is not within the power of the Court to amend clear statutory language. The amending responsibility belongs to the General Assembly and we invite its early attention to the need for reform.

426 A.2d at 827 (citations omitted).

Again, upon reargument, Justice Duffy wrote:

We have made it plain that, in our judgment, the present statutory law embodies poor public policy, in the sense that one who is injured by the negligence of an *under*-insured motorist should have the same benefits under his own policy of insurance as he would have if injured by the negligence of an *un*insured motorist. But we cannot say (as a matter of law) that the present statutory scheme is either "absurd" or "nonsensical," as plaintiff argues.

*Id.* at 828 (emphasis in original).

quired by the financial responsibility law where the auto is principally garaged.

b. One for which the insuring company denies coverage or becomes insolvent.

c. A hit and run motor vehicle that causes an accident resulting in bodily injury or property damage to property of the insured. Bodily injury or property damage must be caused by physical contact of the hit and run vehicle with the insured or with an insured motor vehicle, or by a non-contact vehicle where the identity of both the driver and the owner of such vehicle are unknown. The accident must be reported to the police or proper governmental authority. The insured must notify his insurer within 30 days, or as soon as practicable thereafter, that the insured or his legal representative has a legal action arising out of the accident.

(4) In the event of payment of [sic] any person under uninsured vehicle coverage and, subject to the terms of such coverage, to the extent of such payment, the insurer shall be entitled to the proceeds of any settlement recovery from any person legally responsible for the bodily injury or property damage as to which such payment was made and to amount recoverable from the assets of the insolvent insurer of the other vehicle; provided that this right of subrogation is limited to the amount of coverage required by the financial responsibility law.

(b) Every insurer shall offer to the insured the option to purchase additional coverage for personal injury or death up to a limit of $300,000 but not to exceed the limits for personal injury set forth in the basic policy. Such additional insurance shall be underinsured coverage.

(1) Acceptance of such underinsured coverage shall operate to amend the policy's uninsured coverage to pay for bodily injury damage that the insured or his legal representative are legally entitled to recover from the driver of an underinsured motor vehicle.

(2) An underinsured motor vehicle is one for which there may be bodily injury liability coverage in effect, but the limits of bodily injury liability under all bonds and insurance policies applicable at the time of the accident total less than the limits provided by the underinsured motorist coverage. These limits shall be stated in the Declaration Sheet.

(3) The insurer shall not be obligated to make any payment under this coverage until after the limits of liability under all bodily injury bonds and insurance policies applicable at the time of the accident have been exhausted by payment of settlement or judgments.

(c) The affording of insurance under this section to more than one person or to more than one vehicle shall not operate to increase the limits of the insurers' liability. When two or more vehicles are insured under one policy, the limits of liability shall apply separately to each vehicle as stated in the Declaration Sheet, but shall not exceed the highest limit of liability applicable to any one vehicle.

63 *Del.Laws,* c. 243 (underlining added for emphasis). Subsequently, the Legislature again amended section 3902, *see* 18 *Del.C.* § 3902 (Supp.1984); however, for purposes of this appeal we construe the statute as it appeared in 1982.

### IV

The object of statutory construction is to give a sensible and practical meaning to the statute as a whole in order that it may be applied in future cases without difficulty, *Nationwide Mutual Insurance Co. v. Krongold,* Del.Supr., 318 A.2d 606, 609 (1974); *E.I. Du Pont De Nemours & Co. v. Clark,* Del.Supr., 88 A.2d 436, 438 (1952). If a literal interpretation leaves a result inconsistent with the general statu-

tory intention, such interpretation must give way to the general intent. *Krongold, supra.* Thus, our duty in construing section 3902 is to find the legislative intention and give effect to it. *Murphy v. Board of Pension Trustees,* Del.Supr., 442 A.2d 950, 951 (1982); *Clark, supra.*

■ Given the legislative history of section 3902 and the enactment of the 1982 amendments in response to *Hallowell, supra,*[9] we conclude that the General Assembly intended to equate the statutory provisions controlling uninsured motorist coverage, including subrogation limits, with the statutory provisions governing underinsured motorist coverage. When the Legislature rewrote section 3902 in 1982, it clearly intended to broaden its protective benefits to treat an underinsured tortfeasor's vehicle as an uninsured vehicle. It did so by including underinsured motorist coverage within the definition of uninsured motorist coverage. We refer to section 3902(b), which imposes a statutory obligation upon every carrier to offer additional insurance coverage to its insureds. The section states that "[s]uch additional insurance shall be underinsured coverage." 18 *Del.C.* § 3902(b) (underlining added). Subsection (b)(1) then states that the "[a]cceptance of such underinsured coverage shall operate to amend the policy's uninsured coverage...." 18 *Del.C.* § 3902(b)(1).

Though perhaps inartfully stated, underinsured coverage thereby became, by operation of law, simply a form of uninsured coverage when the tortfeasor's coverage is less than the injured claimant's liability insurance limits. From this, it logically follows that the subrogation limits of section 3902(a)(4) apply to and govern with equal force and effect underinsured as well as uninsured motorist coverage. This follows, notwithstanding the inapt juxtaposition as new subsection (b) of the additional requirements of underinsurance coverage to follow subsection (a)(4).

Under former section 3902, which *dealt* solely with uninsured vehicle coverage, the reservation of an insurer's subrogation rights for payment of uninsured motorist benefits logically appeared as the final subsection of the statute. It seems evident that in the 1982 restatement of section 3902 to broaden its application to underinsured as well as uninsured vehicle coverage, the simplest amending technique was to tack on the new coverage at the end of the former statute. Hence, in the 1982 reenactment the statutory right of subrogation, "limited to the amount of coverage required by the financial responsibility law," precedes rather than follows the statute's broadened requirements of underinsured coverage. In this manner, subsections (a)(4) and (b)(1) may be harmonized. *Murphy, supra.*

Home's construction of section 3902—that subsection (a)(4) only applies to uninsured coverage—leads to an absurd and illogical result. To permit unlimited subrogated recovery against an underinsured motorist but only a limited recovery against an uninsured motorist in the amount required by the Financial Responsibility Law makes no sense. It would penalize a person for carrying insurance above the minimum limits, yet allow a person with no insurance (or coverage in any amount up to the minimum limit) to be insulated from further liability. If adopted, Home's interpretation of section 3902 would discourage drivers from carrying liability insurance in an amount greater than the statutory minimum. The Legislature could not have intended such an illogical result.

■ Our construction of the statute, on the other hand, gives both a sensible and practical meaning to the statute as a whole. *See Krongold, supra; Rodney Square Inv'rs v. Board of Assessment,* Del.Super., 448 A.2d 237, 238 (1982). Accordingly, be-

---

**9.** *See State Farm Mutual Automobile Insurance Co. v. Arms,* Del.Supr., 477 A.2d 1060, 1064 (1984) ("*Hallowell* ... [is] effectively overruled by the 1982 underinsured coverage amendment to 18 *Del.C.* § 3902(b).").

cause Maldonado carried liability insurance in compliance with the Financial Responsibility Laws, section 3902(a)(4) insulates him from any further liability.

■ Turning briefly to Maldonado's alternate ground for affirmance, it would appear that the general release which the Jenifers executed in favor of Maldonado on March 7, 1984 preempted Home from acquiring a right of subrogation against Maldonado, *see Tyre v. Andrews*, Del.Supr., 104 A.2d 775, 776 (1954).[10] However, Maldonado did not plead or argue the release as a defense before the Superior Court. Hence, because this issue was not fairly presented to the Trial Court, we decline, under Supreme Court Rule 8, to rule on

this issue upon appeal. Therefore, we affirm the Superior Court's grant of summary judgment for Maldonado based solely upon our finding that section 3902 evidences a legislative intent that the subrogation limits apply with equal force and effect to both uninsured and underinsured motorist coverage.

\*  \*  \*  \*  \*  \*

Affirmed.

10. In *Tyre*, we held that an insurance company acquires no subrogation rights until it actually makes a payment of the loss to its insured. 104 A.2d at 776. Thus, Home acquired its right to subrogation on March 18, 1985, the date it paid underinsured motorist benefits to the Jenifers. On March 18, 1985, however, the Jenifers had no cause of action against Maldonado because of the general release they executed on March 7, 1984. Therefore, Home could not acquire a right of subrogation on March 18, 1985.