The AETNA CASUALTY AND SURETY COMPANY, a corporation of the State of Connecticut, Defendant Below, Appellant,

v.

Donna KENNER and Mark Kenner, her husband, By and Through Donna Friedman, Plaintiffs Below, Appellees.

Supreme Court of Delaware.

Submitted: Sept. 27, 1989.
Decided: Feb. 21, 1990.
Rehearing Denied March 26, 1990.

Gary W. Aber (argued) and Donald L. Gouge, Jr., Heiman, Aber & Goldlust, Wilmington, for appellant.

Bernard A. Van Ogtrop (argued), Cooch & Taylor, Wilmington, for appellees.

Before CHRISTIE, C.J., HORSEY, MOORE and WALSH, JJ., and HARTNETT, Vice–Chancellor (sitting by designation pursuant to Del. Const. art. IV, § 12), constituting the Court *en banc*.

WALSH, Justice, for the majority.

In this appeal, we are again called upon to examine the scope of automobile insurance coverage afforded under uninsured and underinsured motorist policies issued pursuant to 18 *Del.C.* § 3902. The case concerns the construction of language defining the limits of underinsured coverage in a policy issued by the Aetna Casualty and Surety Co. ("Aetna"). Aetna appeals from a decision of the Superior Court that adopted the interpretation of the policy advanced by appellee, Donna Kenner ("Kenner").[1] The court held that the policy requires that monies recovered from a tort-

---

1. Although plaintiffs Mark Kenner and Donna Friedman join in this appeal, we will refer to the appellees collectively as "Kenner".

feasor should be deducted from the total damages suffered by an insured before Aetna's liability under the uninsured/underinsured coverage of the policy is applied. Aetna contends that the amounts recovered from the tortfeasor should be subtracted directly from the policy limits that set a cap on Aetna's liability to its insured. We find that Aetna's interpretation is grounded in the clear and unambiguous language of the policy. We also view this interpretation as consonant with the public policy underlying section 3902. Thus, we reverse the judgment of the Superior Court.

I

The facts are essentially uncontroverted. On February 2, 1985, Kenner was seriously injured while operating an automobile owned by her mother, Donna Friedman ("Friedman"). Friedman was insured under a policy issued by Aetna. The policy provided liability insurance in the amount of $300,000 per accident as well as uninsured motorist coverage of $30,000 per accident.

On July 18, 1985, Kenner filed an action in the Superior Court, seeking payment of insurance benefits and a judicial reformation of the terms of Friedman's policy. The court found that Aetna had not adequately advised Friedman of her option to purchase up to $300,000 of uninsured motorist coverage, as required by 18 *Del.C.* § 3902(b). Accordingly, the court ruled that the limits of coverage should be revised upward to provide the full protection available under section 3902(b). *Kenner v. Aetna Casualty & Sur. Co.*, Del.Super., C.A. No. 85C–JL–87, Babiarz, J., 1987 WL 10532 (Apr. 24, 1987). *See also State Farm Mut. Auto. Ins. Co. v. Arms*, Del. Supr., 477 A.2d 1060 (1984). Aetna has not appealed this ruling.

Sometime thereafter, the Kenners settled their claim against the tortfeasor respon-

sible for Kenner's accident for $100,000. Because Kenner claimed damages well in excess of the settlement amount, she sought payment of $300,000 under the newly reformed uninsured/underinsured provisions of Friedman's policy. Under the policy's terms, Aetna agreed to "pay damages which a covered person is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injury sustained by a covered person and property damage caused by an accident." [2] The definition of "uninsured motor vehicle" includes an "underinsured motor vehicle" within its scope. An "underinsured motor vehicle" is defined as "a land motor vehicle or trailer of any type to which a bodily injury liability bond or policy applies; provided its limit for bodily injury liability is less than the limit of liability for this coverage." [3] This language is similar to that found in 18 *Del.C.* § 3902(b)(2).

Under the section entitled "Limits of Liability," the policy states:
B. If a single limit of liability for bodily injury liability is shown in the Declarations for this coverage, this is our maximum limit of liability for all damages for bodily injury resulting from any one auto accident.

The section further provides:
D. ....
Any amount otherwise payable for damages under this coverage shall be reduced by:
1. All sums paid because of bodily injury or property damage by or on behalf of persons or organizations who may be legally responsible.

The nub of the parties' dispute is the extent to which the policy sections, read together, serve to reduce the amount of uninsured/underinsured coverage. Kenner contends that her $100,000 recovery from the tortfeasor must be subtracted from the total damages suffered, leaving Aetna responsible for any remaining damages, up to the $300,000 policy limit. Thus, if Kenner

2. The parties agree that Kenner is a "covered person" within the meaning of the policy.

3. Because the $100,000 of liability coverage carried by the tortfeasor is less than the $300,000 carried by Friedman, the tortfeasor's vehicle is clearly an "underinsured motor vehicle" within the meaning of the policy.

suffered $500,000 of damages, she argues that her recovery from the tortfeasor should be subtracted from this figure, leaving $400,000 in uncompensated injury. Aetna would then be responsible for $300,000 of this amount. By contrast, Aetna contends that the $100,000 recovery should be subtracted from the policy's $300,000 limit, leaving Aetna responsible for $200,000 of further damages.

The Superior Court granted Kenner's motion for summary judgment, holding that the interpretation of the policy language advanced by Kenner was "the more reasonable one." *Kenner v. Aetna Casualty & Sur. Co.*, Del.Super., C.A. No. 85C-JL-87, Poppiti, J., 1989 WL 12226 (Jan. 30, 1989). The court found no ambiguity in the policy language and ruled that even if such ambiguity had been present, the policy terms would be construed in the insured's favor.

## II

Initially, we note the standard and scope of our review in this appeal. The correct construction of any contract, including an insurance policy, is a question of law. Accordingly, we review the Superior Court's decision for legal error. *Rohner v. Niemann*, Del.Supr., 380 A.2d 549, 552 (1977).

We recognize that we may rule in Aetna's favor only if the policy interpretation that it advances is clearly correct. If there is any ambiguity in the policy, that ambiguity must be resolved in favor of the insured and against the insurer that drafted the policy. *Steigler v. Insurance Co. of N. Am.*, Del.Supr., 384 A.2d 398, 400 (1978). As we noted in *Hallowell v. State Farm Mutual Automobile Insurance Co.*, Del. Supr., 443 A.2d 925 (1982), however, "if the language is clear and unambiguous a Delaware court will not destroy or twist the words under the guise of construing them." *Id.* at 926. Ambiguity does not exist merely because two conflicting interpretations may be suggested. Rather, both interpretations must reflect a reasonable reading of the contractual language. Moreover, we must examine all relevant portions of the policy, rather than reading a single passage in isolation. *Cheseroni v. Nationwide Mut. Ins. Co.*, Del.Super., 402 A.2d 1215, 1217 (1979), *aff'd*, Del.Supr., 410 A.2d 1015 (1980).

Thus, while the argument offered by Kenner is based on a *possible* construction of the policy, it does not reflect a reasonable reading of the plain language of the policy. We find the meaning of the disputed passages to be clear and unambiguous. As a result, we may not distort the policy in an effort to achieve a different construction.

 The Limits of Liability section of Aetna's policy must be read as a whole. Subsection B of that section establishes that there is a "maximum limit of [Aetna's] liability for all damages." As determined by the judicial reformation of the policy, that limit is $300,000. No matter how extensive the insured's damages, the most that Aetna could ever be called upon to pay is $300,000. *See O'Hanlon v. Hartford Accident & Indem. Co.*, D.Del., 439 F.Supp. 377 (1977), *modified on other grounds*, 3d Cir., 639 F.2d 1019 (1981) (upholding enforceability of contractual limits on liability).

Later, in subsection D of the same section, the limits of Aetna's liability are further qualified. The policy speaks of "sums paid ... by or on behalf of persons or organizations who may be legally responsible." All parties agree that the $100,000 recovered from the tortfeasor is such a sum. Therefore, it must be subtracted from "[a]ny amount otherwise payable for damages *under this coverage*." (emphasis added). We believe that this clause is susceptible to only one reasonable interpretation. The clause refers to an amount payable "under this coverage." Regardless of the damages suffered by Kenner, the greatest amount that Aetna would ever be called upon to pay is $300,000. Thus, if Kenner suffered $500,000 worth of damages, the "amount ... payable for damages under this coverage" would still be $300,000. The $100,000 recovered from the tortfeasor must be subtracted from this amount, leaving Aetna responsible for $200,000 of the total damages suffered.

Kenner argues that the $100,000 should be subtracted from the damages that she suffered, leaving Aetna responsible for up to $300,000 of any remaining damages. We see no means of achieving this result without ignoring the plain language of the policy. If the words "under this coverage" were removed from the policy, Kenner's interpretation might be reasonable. Similarly, if the policy read "any amount otherwise payable for damages *of the type compensated* under this coverage," we could find a measure of uncertainty that would warrant a ruling against Aetna. However, we find no such ambiguity in the policy as actually worded. "Any amount otherwise payable" clearly refers to the $300,000 limit of liability established in the same section of the policy.

### III

■ The interpretation of the Aetna policy that we adopt is wholly consistent with the intent of the General Assembly in requiring insurers to offer uninsured/underinsured coverage. Under 18 *Del.C.* § 3902(b), every insurer must offer its insureds the option to purchase up to $300,000 of uninsured/underinsured coverage, but such coverage is "not to exceed the limits for bodily injury liability set forth in the basic policy." *Id.* Thus, if a policy has a basic liability limit of $100,000, the insurer is not required to offer more than $100,000 of uninsured/underinsured coverage. If, however, the basic coverage limit were $300,000, the insured must be given the option to purchase up to that amount of uninsured/underinsured coverage.

As we stated recently in *Frank v. Horizon Assurance Co.*, Del.Supr., 553 A.2d 1199 (1989):

[T]he public policy underlying section 3902 is to permit an insured to protect himself from an irresponsible driver causing injury or death. This public policy is achieved by making available *coverage that mirrors his liability insurance* through the purchase of uninsured motorist coverage.

*Id.* at 1205 (emphasis added) (citation omitted). *See also Brown v. Comegys*, Del.Su-

per., 500 A.2d 611, 614 (1985). Thus, while the insured's basic liability protection allows him to create a fund to indemnify losses arising from his own negligent acts, uninsured/underinsured coverage permits him to establish a fund of the same value to protect against losses caused by drivers who carry less liability coverage. When a motorist who carries full uninsured/underinsured coverage takes to the highways, he knows that a certain amount of protection will always be available. The value of that coverage will be the same whether the accident is caused by the insured himself or by another driver who carries a lesser amount of liability protection.

The policy under which Kenner is insured provides $300,000 for both basic liability and uninsured/underinsured coverage. Thus, the policy limits are consistent with the public policy of allowing the two forms of coverage to mirror one another. The policy interpretation we adopt allows Kenner to receive precisely $300,000 of compensation, an amount equal to her own liability coverage.

By contrast, the interpretation of the policy advanced by Kenner would allow her to recover more than the $300,000 envisioned by section 3902(b). Moreover, the extent of her recovery would depend on the identity of the party causing the accident, a result that is at odds with the "mirror" concept that underlies uninsured/underinsured coverage. An example will illustrate the anomaly inherent in Kenner's interpretation. Suppose that motorist A, who carries $300,000 in liability insurance and $300,000 in uninsured/underinsured coverage, is involved in an accident with motorist B and suffers $600,000 worth of damage. If B caused the accident and had no insurance, A would recover $300,000 under his uninsured coverage. If B were underinsured, A's recovery would exceed $300,000 and would increase with the value of B's coverage. Thus, under Kenner's interpretation, if B carried $299,999 worth of liability insurance, A would recover all but one dollar of his damages. If, however, B were fully insured at $300,000, A's recovery would again stand at $300,000. We see

no reason why the General Assembly would favor the victims of underinsured tortfeasors over the victims of either uninsured or fully insured tortfeasors.

Kenner relies principally upon two unreported decisions of the District Court for the District of Delaware. *Whaley v. Allstate Ins. Co.*, D.Del. C.A. No. 83–846–JLL, Latchum, J. (July 10, 1985); *O'Hanlon v. Hartford Accident & Indem. Co.*, D.Del., C.A. No. 76–59, Stapleton, J. (Feb. 15, 1979). In both cases, the court examined policy language similar to that contained in the Friedman policy and concluded that the interpretation offered by the insured was the more reasonable one. Of course, this Court is not bound by the District Court's interpretation of Delaware law. In *O'Hanlon*, the court relied solely upon its own reading of the policy language, adopting a construction that we find to be contradicted by the plain meaning of the words used. In *Whaley*, moreover, the court articulated a policy rationale for its decision that is at odds with our own construction of section 3902. The *Whaley* court asserted that "[n]o rational and informed consumer" would purchase uninsured/underinsured coverage if its scope could be limited by recovery from other insurance policies. *Whaley*, slip op. at 6. As we have already shown, however, uninsured/underinsured coverage is best viewed as a supplemental form of coverage that allows the insured to achieve a recovery from all tortfeasors that is equal to his own liability coverage. Indeed, the insurer's statutory duty to offer matching insured/underinsured coverage arises only in connection with the purchase of liability insurance. In keeping with the supplemental nature of the coverage, the premiums for uninsured/underinsured protection are generally markedly lower than those for basic liability protection. As a result, one would expect the "rational and informed consumer" to purchase uninsured/underinsured coverage, rather than to permit protection against loss to depend solely upon the resources of the tortfeasor who happens to cause his loss. Finally, we note that since *O'Hanlon* and *Whaley* were decided, the District Court has adopted an interpretation of unin-

sured/underinsured coverage that is consistent with our own. *Corso v. State Farm Mut. Auto. Ins. Co.*, D.Del., 668 F.Supp. 364 (1987), *aff'd*, 3d Cir., 838 F.2d 1205 (1988).

Kenner argues that insureds should be permitted to purchase more coverage than is mandated by statute. Section 3902(b) addresses the coverage that insurers must *offer*. Thus, it is true that nothing in the statute would prevent an insurer and an insured from contracting for more than $300,000 worth of coverage. As has already been made clear, however, the plain language of the policy issued by Aetna provides no evidence that the parties attempted to achieve that result. Indeed, the limits of Friedman's policy were established not by negotiation, but by a judicial reformation of the policy. In reforming the policy, the Superior Court followed the logic of this Court's decision in *State Farm Mutual Automobile Insurance Co. v. Arms*, Del.Supr., 477 A.2d 1060 (1984). There we held that if an insurer fails to offer uninsured/underinsured coverage in accordance with section 3902(b), it is deemed to have made a *continuing* offer of such coverage, which may be accepted by the insured even after an accident that implicates the coverage has occurred. Thus, because the insurer has failed to comply with the statute, it will be estopped from denying its insured the benefits available under the statute. However, there is no basis in the statute or in the decisions of this Court for deeming Aetna to have offered coverage that *exceeds* the requirements of section 3902(b) or that creates an illogical distinction between underinsured motorists and uninsured or fully insured motorists. The statute was enacted to give motorists the option of establishing a pool that would allow them to achieve the same recovery from all motorists. Without at least some ambiguity in the language of the policy, we cannot conclude that the parties ever would have intended to contract for coverage that deviated from the requirements of the statute.

In sum, we conclude that Aetna is permitted to deduct the $100,000 recovered

from the tortfeasor from its $300,000 limit of liability before making any payments under the Friedman policy. This result is dictated both by the language of the insurance contract and by the public policy underlying 18 *Del.C.* § 3902. Accordingly, the judgment of the Superior Court is REVERSED.

MOORE, Justice, dissenting, with whom HARTNETT, Vice Chancellor, joins:

The majority holds that the disputed policy language unambiguously allows Aetna to offset monies received from the tortfeasor against the insurer's policy limits. I dissent because the wording of the policy is ambiguous. An equally plausible reading would offset amounts received from the tortfeasor against the victim's total damages. Applying standard rules of construction, the policy must be interpreted against the insurer. Moreover, in contrast to the majority view, the latter interpretation is more consistent with the overriding purpose of 18 *Del.C.* § 3902 and other liability insurance statutes enacted to protect fully the innocent victims of automobile accidents. Although section 3902 establishes only a floor for coverage, the majority's interpretation effectively imposes a ceiling on a victim's recovery.

**I.**

I first turn to basics. When the language of an insurance contract is clear and unequivocal, the parties are bound by its plain meaning. *Hallowell v. State Farm Mut. Auto. Ins. Co.*, Del.Supr., 443 A.2d 925, 926 (1982); *Apotas v. Allstate Ins. Co.*, Del.Supr., 246 A.2d 923, 925 (1968); *Lamberton v. Travelers Indem. Co.*, Del. Super., 325 A.2d 104, 106 (1974), *aff'd*, Del. Supr., 346 A.2d 167 (1975). If the language is ambiguous, however, it will be construed strictly against insurer to effectuate the reasonable expectations of the insured. *Hallowell*, 443 A.2d at 926; *Steigler v. Insurance Co. of N. Am.*, Del. Supr., 384 A.2d 398, 400–01 (1978). An ambiguity exists when two or more reasonable interpretations of a contract are possi-

ble. *Hallowell*, 443 A.2d at 926; *Cheseroni v. Nationwide Mut. Ins. Co.*, Del.Super., 402 A.2d 1215, 1217 (1979), *aff'd*, 410 A.2d 1015 (1980); *Lamberton*, 325 A.2d at 106. In determining the meaning of the contract, its language must be read in context and not in isolation. *Cheseroni*, 402 A.2d at 1217.

The disputed policy contains the following provisions in its "Limits of Liability" section:

B. If a single limit of liability for bodily injury liability is shown in the Declarations for this coverage, this is our maximum limit of liability for *all damages* for bodily injury resulting from any one auto accident.

. . . .

D. . . . .

*Any amount otherwise payable for damages under this coverage* shall be reduced by:

(1) All sums paid because of bodily injury or property damage by or on behalf of persons or organizations who may be legally responsible.

(emphases added). These provisions expressly refer to Aetna's liability in terms of damages, not policy limits. They must be read together. Subsection B limits Aetna's liability for *all damages*. Subsection D similarly refers to *any amount otherwise payable for damages under this coverage*, and allows a reduction for amounts paid by the tortfeasor. Certainly one reasonable interpretation is that the words "any amount otherwise payable for damages" in subsection D refer back to the general damages provision of subsection B concerning "all damages". Thus, one construction of the policy's plain language offsets amounts recovered from tortfeasors against the victim's total damages.

The majority finds this view unreasonable. It believes the policy requires monies recovered from the tortfeasor to be offset only against the limits of the policy, although that express wording is never used. The majority reaches its conclusion because the phrase "any amounts otherwise payable for damages" is followed by the words "under this coverage". From this lan-

guage, it infers that in addition to the $300,000 limit stated in the declarations, the parties meant to limit the insurer's liability further by requiring any monies recovered from the tortfeasor to be offset against the policy limits rather than against total damages. It is unnecessary for me to consider whether the majority reasonably interprets the policy. I dissent because it is not the *only* reasonable interpretation, as evidenced by the plain language of the contract, judicial decisions interpreting similar provisions, and public policy considerations.[1]

I have already noted above that two reasonable interpretations of the policy language are possible. Courts interpreting nearly identical policy provisions under similar circumstances have also been unable to reach a consensus as to their meaning. Some, like the majority, have found such wording to require a reduction from policy limits. *Corso v. State Farm Mut. Auto. Ins. Co.*, 668 F.Supp. 364 (D.Del.1987) (policy language "any amount payable under this coverage" unambiguously required reduction from policy limits), *aff'd mem.*, 838 F.2d 1205 (3d Cir.1988); *Giardino v. American Family Ins.*, 164 Ill.App.3d 389, 115 Ill.Dec. 501, 517 N.E.2d 1187 (1987) (policy language "any amounts payable" clearly required reduction from policy limits), *appeal denied*, 119 Ill.2d 556, 119 Ill.Dec. 384, 522 N.E.2d 1243 (1988); *State Farm Mut. Auto. Ins. Co. v. Kuehling*, Miss.Supr., 475 So.2d 1159 (1985) (policy language "any amount payable under this section" required offset against policy limits). Others have interpreted similar wording to require an offset from total damages. *O'Hanlon v. Hartford Acc. & Indem. Co.*, C.A. No. 76–59, slip op. at 4–5, Stapleton, J. (D.Del. Feb. 15, 1979) (policy language "any amount payable under the terms of this insurance" required reduction against total damages and not policy limits); *Gomolka v. State Auto. Mut. Ins. Co.*, 15 Ohio St.3d 27, 472 N.E.2d 700 (1984) (policy language "any amount payable under the Uninsured Motorists Coverage" required offset

against total damages); *McCoy v. Aetna Cas. & Sur. Co.*, 281 Md. 26, 374 A.2d 1170 (1977) (policy language "any amount payable to an insured under the terms of this insurance" required setoff against total damages). Yet another court, interpreting language identical to that found in Aetna's policy, has found it ambiguous, and construed it against the insurer. *Mulliss v. American Protection Ins. Co.*, 653 F.Supp. 685 (D.Vt.1987) (policy language "any amounts otherwise payable for damages under this coverage" was ambiguous so reduction against total damages was required). The sheer number and diversity of these decisions strongly suggests that the disputed policy language is capable of more than one reasonable interpretation, particularly since one of the cases involved wording identical to that found here. The majority cited none of these decisions in its analysis of the policy language, relying only on its own conception of reasonableness.

Two additional considerations lead me to conclude that requiring a reduction from total damages is a reasonable interpretation of the policy. In *Gomolka v. State Automobile Mutual Insurance Company*, the Supreme Court of Ohio emphasized the notion of bargained-for protection underlying contracts of insurance. It stated:

> The [insurer]'s interpretation ... equates "amount payable" to "damages compensable" by looking to the plain meaning of the policy's terms and by focusing on the nature and purpose of uninsured/underinsured motorist coverage. *When purchasing this coverage, an insured expects to be protected against a loss caused by another that is not covered by that other person's insurer.* Thus, an "amount payable" under uninsured/underinsured motorist coverage is an *amount of damages suffered* by the insured, which amount is greater than the insurance coverage held by the party causing the damages.

1. If our laws were different, and courts were required to determine which interpretation was more reasonable, one might criticize the majority's inordinate focus on the words "under this coverage" to achieve its interpretation of the policy.

*Gomolka,* 472 N.E.2d at 703 (emphasis added). *See also Mulliss,* 653 F.Supp. at 690 (quoting same text); *Whaley v. Allstate Ins. Co.,* C.A. No. 83–846, Latchum, J. (D.Del. July 11, 1985). The majority rejects this notion of bargained-for protection on statutory grounds because it creates "an illogical distinction between underinsured motorists and uninsured or fully insured motorists." *Ante,* at 1176. I fail to see how the distinction is illogical since, as noted below, the statute creates only a floor of available coverage. It is not illogical that plaintiffs are able to recover the full measure of their damages from tort-feasors with sufficient resources; it is an unavoidable aspect of our tort law that some parties have insufficient resources. Section 3902 did not and could not eradicate those economic distinctions.

Moreover, if the reduction clause were meant to apply to policy limits rather than total damages, it would have explicitly referred to them. *Id.* at 703–03; *Gomolka,* 472 N.E.2d at 702–03. *Cf. James v. Michigan Mut. Ins. Co.,* 18 Ohio St.3d 386, 481 N.E.2d 272, 275 (1985) (comparing policy referring to damages with another stating "the *limit of liability shall be reduced* by"). Other Delaware insurers have incorporated language expressly referring to policy limits in their reduction clauses. *See Kulas v. Nationwide Gen. Ins. Co.,* Del. Super., C.A. No. 87C–OC–87, slip op. at 6, Babiarz, J., 1989 WL 64086 (May 30, 1989) ("Uninsured Motorist *limits* will be reduced by all sums paid by or for any liable parties...."); *DiIenno v. Nationwide Ins. Co.,* 632 F.Supp. 1253 (D.Del.1986) ("The *limits* of this coverage and/or any amounts payable under this coverage will be reduced by ... [a]ny amounts paid by or for any liable parties."). In the absence of such limiting language, Aetna's policy does not unambiguously require monies received from a tortfeasor to be offset against poli-

cy limits rather than against total damages. Being susceptible of two reasonable interpretations, the policy is ambiguous, and should be interpreted against Aetna.

## II.

Having found the policy language ambiguous, I must consider whether its interpretation offends the public policy underlying our insurance statutes. Section 3902 provides in part:

> Every insurer shall offer to the insured the option to purchase additional coverage for personal injury or death up to a limit of $100,000 per person and $300,000 per accident or $300,000 single limit, but not to exceed the limits of bodily injury liability set forth in the basic policy. Such additional insurance shall include underinsured bodily injury liability coverage.

18 *Del.C.* § 3902(b). The section "permit[s] an insured to protect himself from an irresponsible driver causing injury or death." *Frank v. Horizon Assur. Co.,* Del.Supr., 553 A.2d 1199, 1205 (1989). It establishes a floor of uninsured/underinsured motorist coverage that insurers are required to offer, *see State Farm Mut. Auto. Ins. Co. v. Abramowicz,* Del.Supr., 386 A.2d 670, 672 (1978); *Corso,* 668 F.Supp. at 370; *O'Hanlon,* 439 F.Supp. at 383, but it does not prohibit insurers from contracting to provide coverage in excess of the statutory floor. *Goodman v. Continental Cas. Co.,* Del.Super., 347 A.2d 662, 666 (1975). *Cf. Mulliss,* 653 F.Supp. at 691; *LaFrange v. United States Auto. Ass'n,* Ky.Supr., 700 S.W.2d 411 (1985).

On its face, section 3902 does not address the question on appeal: whether monies recovered from a tortfeasor must be offset against the insured's total damages or the insurer's policy limits.[2] Based on language

---

**2.** Aetna argued on appeal that our decision in *State Farm Mut. Auto. Ins. Co. v. Arms,* Del. Supr., 477 A.2d 1060 (1984), required those injured by an underinsured motorist to receive no more compensation than those injured by an uninsured motorist. In a footnote we stated: "[W]hen a policyholder is injured by a driver whose coverage is less than the policyholder's

underinsured coverage, the injured policyholder *may* recover the difference from his own insurer." *Arms,* 477 A.2d at 1063 n. 3 (emphasis added). The footnote suggested how section 3902 could work under a properly drafted contract, but it did not address the situation here involving ambiguous wording. Certainly section 3902 allows insurers to offset against policy

in *Frank v. Horizon Assurance Company* describing how section 3902 is applied, 553 A.2d at 1205, the majority contends that its interpretation is the only one consistent with the concept of "mirrored coverage" underlying section 3902. According to the majority, the alternative construction noted above violates the mirror concept because it favors the victims of underinsured tortfeasors over the victims of either uninsured or fully insured tortfeasors. The majority's emphasis on the mirror metaphor ignores the overriding public policy rationale for the statute recognized by *Frank* and numerous other cases.

In *Frank* the insured's daughter was injured by an uninsured motorist while she was driving a vehicle owned by the insured but not listed in the contract of insurance. The insurer denied coverage based on a policy exclusion for "other motor vehicles" ("OMV") which it argued was permitted under the statute. We struck down the OMV exclusion as inconsistent with the public policy underlying section 3902 and mandatory liability insurance statutes, noting:

> Once uninsured motorist coverage is purchased, the insurance consumer is entitled to the full extent of the benefit which the law requires to be offered. Attempts by insurers to reduce this benefit by hypertechnical language or exclusion clauses are equally repugnant to the public policy articulated in *Wagamon*—the protection of persons injured in automobile accidents.

*Id.* The majority now does exactly what it prohibited in *Frank* by adopting a hypertechnical interpretation of the statute and imposing a ceiling on victims' recovery. Its interpretation may or may not be faithful to the mirror metaphor used in *Frank*, but its approach is clearly inconsistent with the overriding purpose of our insurance laws, acknowledged by *Frank*, and recognized in other cases, to compensate fully those persons injured in automobile accidents. *Arms*, 477 A.2d at 1064. *See also Hudson v. State Farm Mut. Ins. Co.*, Del. Supr., 569 A.2d 1168, 1171 (1990); *State*

*Farm Mut. Auto Ins. Co. v. Wagamon*, Del.Supr., *541 A.2d 557, 560 (1988)*. Cf. *Frank*, *553 A.2d at 1204–05;* Abramowicz, *386 A.2d at 672;* Home Ins. Co. v. Maldonado, *Del.Supr.*, *515 A.2d 690, 693 (1986)*. *Absent express limitation in the contract, this Court should favor the interpretation supporting full recovery for the insured.*

The Delaware Insurance Code establishes a floor for certain types of liability coverage. It does not require equal compensation to be paid to those injured by uninsured and underinsured motorists if terms of the contract suggest otherwise. The overriding purpose of section 3902 and other statutes requiring insurers to offer or provide liability insurance is to protect the innocent victims of automobile accidents. While the majority's approach is somewhat consistent with that purpose, it effectively imposes a ceiling on recovery. The alternative construction is more consistent because it provides greater protection to innocent victims.

In summary, I find the disputed policy ambiguous and would construe it in favor of the insured. Since this interpretation does not violate the underlying policy of section 3902, and indeed supports it more than other interpretations, the decision of the Superior Court should be AFFIRMED.

limits, *see e.g., Kulas*, slip op. at 6, but it does not require that approach.