**ALLSTATE INSURANCE COMPANY, Plaintiff,**

v.

**William GILLASPIE, Defendant.**

**C.A. No. 95C–03–196.**

Superior Court of Delaware, New Castle County.

Submitted: June 26, 1995.
Decided: Aug. 7, 1995.

Dennis D. Ferri, Dennis D. Ferri, P.A., Wilmington, for Plaintiff.

Bartholomew J. Dalton, Brandt and Dalton, P.A., Wilmington, for Defendant.

## OPINION AND ORDER

QUILLEN, Judge:

Plaintiff, Allstate Insurance Company ("Allstate"), has filed this declaratory judgment action pursuant to 10 *Del.C.* § 6501 seeking a determination of whether the defendant, William Gillaspie ("Gillaspie"), is entitled to uninsured/underinsured motorist ("UM") coverage benefits. Allstate and Gillaspie have filed Cross Motions for Summary Judgment.

### *FACTS*

The facts of this case are not in dispute. On April 1, 1994, Gillaspie sustained personal injuries in an automobile accident. The third-party tortfeasor was insured by USAA Casualty Insurance Company pursuant to an automobile policy that provided liability bodily injury limits of $15,000 per person and $30,000 per accident. USAA tendered the policy limits of $15,000 to Gillaspie and obtained a release of all claims. At the time of the accident, Gillaspie was insured under Allstate Policy No. 008256310 ("the Allstate policy") which in part provided UM coverage in the amount of $15,000 per person and $30,000 per accident. For purposes of this declaratory judgment action, the parties have stipulated that Gillaspie sustained damages in excess of $15,000. Gillaspie contends the tortfeasor's vehicle was underinsured and that he is entitled to UM coverage benefits under the Allstate policy.

In particular, Gillaspie contends that UM insurance should cover his damages between $15,000 and $30,000 or an additional $15,000 over the tortfeasor's liability limits. Allstate, on the other hand, claims it has no responsibility on the UM coverage because such coverage in this case is only coextensive with the tortfeasor's liability coverage on which there has already been full recovery.

Title 18 *Del.C.* § 3902(b)(2) defines an underinsured motor vehicle as follows:

An underinsured motor vehicle is one for which there may be bodily injury liability coverage in effect, but the limits of bodily injury liability coverage under all bonds and insurance policies applicable at the time of the accident total **less than** the

limits provided by the uninsured motorist coverage. These limits shall be stated in the declaration sheet of the policy. (Emphasis added).

The applicable Allstate policy provision states that an underinsured automobile is:

A motor vehicle which has liability protection in effect and applicable at the time of the accident in an amount equal to or greater than the amounts specified for bodily injury liability by the financial responsibility laws of Delaware, but **less than** the applicable limit of liability for this coverage shown on the declarations page. (Emphasis added).

The parties have filed Cross Motions for Summary Judgment on the issue of whether Gillaspie is entitled to UM coverage benefits under either 18 *Del.C.* § 3902(b)(2) or the Allstate policy.

## *DISCUSSION*

When considering a motion for summary judgment, the Court's function is to examine the record to determine whether genuine issues of material fact exist. *Oliver B. Cannon & Sons, Inc. v. Dorr–Oliver, Inc.,* Del.Super., 312 A.2d 322, 325 (1973). If after viewing the record in a light most favorable to the non-moving party, the Court finds there are no genuine issues of material fact, summary judgment will be appropriate. *Id.* Summary judgment will not be granted if the record indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances. *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467 (1962). This case turns on a question of law and summary judgment is appropriate.

The undisputed facts indicate that Gillaspie received the $15,000 limits under the tortfeasor's liability bodily injury policy. The limits of the tortfeasor's coverage, which complied with Delaware's financial responsibility requirements as stated in 21 *Del.C.* §§ 101(27) and 2902(b), were equal to the UM coverage provided under the Allstate policy. The parameters of coverage under the Allstate policy are dictated by 18 *Del.C.* § 3902 because insurance policy provisions which reduce or limit coverage to less than that prescribed by § 3902 are void. *Frank v. Horizon Assurance Co.,* Del.Supr., 553 A.2d 1199, 1201–02 (1989). Based on a literal reading of § 3902(b)(2), the third-party tortfeasor's automobile was not underinsured because bodily injury liability coverage in effect did not total "less than the limits provided by the [UM] coverage." Also, this Court said previously that where a plaintiff's UM policy limits equal a tortfeasor's liability insurance policy limits, there is "no possibility of an 'underinsurance' situation within the meaning of 18 *Del.C.* § 3902(b)(2)." *Dixon v. Reid,* Del.Super., C.A. No. 86C–NO–14, 1990 WL 123000, Steele, J. (July 26, 1990) (Mem.Op.); *see also Binder v. State Farm Mut. Auto. Ins. Co.,* Del.Super., C.A. No. 91C–11–111, Taylor, J. (June 26, 1992) (Order) (citations omitted). The Allstate policy terms in question here essentially echo the language of § 3902(b)(2).

Gillaspie, however, maintains that this case is controlled by the recently decided *Hurst v. Nationwide Mut. Ins. Co.,* Del.Supr., 652 A.2d 10, 11 (1995) (overruling to the extent inconsistent *Aetna Casualty and Sur. Co. v. Kenner,* Del.Supr., 570 A.2d 1172 (1990)). According to Gillaspie's argument, the change in Supreme Court decisional law manifested in *Hurst* warrants a finding in this case requiring Allstate to provide UM coverage benefits regardless of the plain language of § 3902(b)(2) and the prior decisions of this Court noted above.

In *Kenner,* the Court interpreted an UM policy and permitted a plaintiff's $100,000 recovery from a settling tortfeasor to be offset against her $300,000 UM policy limit rather than the total damages sustained by the plaintiff. *Kenner,* 570 A.2d at 1175. Thus, under *Kenner,* a $400,000 claim would result in a total payment of $300,000, $100,000 from the settling tortfeasor and $200,000 from UM coverage. The Court said that this interpretation allowed the plaintiff to receive precisely $300,000, "an amount equal to her own liability coverage." *Id.* According to the *Kenner* Court, this interpretation of the policy was consistent with the public policy of 18 *Del.C.* § 3902:

[T]o permit an insured to protect himself from an irresponsible driver causing injury or death. This public policy is achieved by making available *coverage that mirrors his liability insurance* through the purchase of uninsured motorist coverage.

*Id.* (quoting *Frank,* 553 A.2d at 1205).

Through the "mirror" image concept, the Court indicated that UM coverage under § 3902(b) acted both as a ceiling and as a floor. As a floor, UM coverage allowed an insured to create a fund of the same value as his or her basic liability coverage to protect against losses caused by another who carried less liability coverage. *Id.* at 1175. As a ceiling, an insured's recovery was limited to an amount equal to his or her own UM coverage. *Id.* at 1175–76.

The *Hurst* Court reexamined the public policies underlying 18 *Del.C.* § 3902. *Hurst,* 652 A.2d at 13. In *Hurst,* a plaintiff was seriously injured when a negligent uninsured motorist collided with the truck she was driving. The truck was insured under a policy issued to her employer which provided $40,-000 in UM coverage. The same insurance carrier was also her employer's workmen's compensation carrier and paid the plaintiff $45,054.41 for medical expenses and total temporary disability. Thus, the workmen's compensation lien exceeded UM coverage and the insurance company credited itself with the full amount of the UM coverage or $40,000. *Id.* at 11–12.

At the time of the accident, the plaintiff in *Hurst* also maintained insurance with a different carrier on her own motor vehicle. The policy provided the plaintiff with UM coverage in the amount of $50,000. The plaintiff appealed the Superior Court's decision which, based on *Kenner,* interpreted 18 *Del.C.* § 3902 as permitting an insurer to subtract payments made on behalf of a tort-feasor from the policy limits of UM coverage. Thus, the Superior Court had directed the insurer to pay the plaintiff the remaining $10,000 under the policy, i.e. $50,000 less $40,000. *Id.* at 12.

The Supreme Court reversed and held that the reduction or exhaustion required by 18 *Del.C.* § 3902(b)(3)[1] should be set-off against the claimant's total damages for bodily injury and not the limits of a claimant's UM coverage. *Id.* at 13. Thus, under *Hurst,* a valid $90,000 claim would result in total payments of $90,000, $40,000 under the employer's UM coverage and $50,000 under the plaintiff's own UM coverage.[2] The Court overruled *Kenner* to the extent that it was inconsistent. *Id.* at 11. The Court said to the degree "that the innocently injured claimant has not been fully compensated for all the bodily injury damages that could legally be recovered from the uninsured/underinsured driver, the claimant is entitled to be paid for the uncompensated bodily injuries, up to the full policy limits of the uninsured coverage." *Id.* at 13–14. The Court, however, cited specifically and exclusively to 18 *Del.C.* § 3902(b)(1) and (3) and not to § 3902(b)(2), the statutory provision at issue in this case. *Id.* at 13.

The *Hurst* Court said that this "construction of Section 3902 is consistent with the prior decisions of this Court recognizing that the 'legislative intent to compensate fully innocent drivers has been and continues to be evident on the face of our uninsured motorist laws.'" *Id.* at 14 (citing *State Farm Mut. Auto. Ins. Co. v. Arms,* Del.Supr., 477 A.2d 1060, 1064 (1984)).[3] The Court also said that the "purpose of Section 3902 is to permit a risk adverse person to establish a fund to protect against losses caused by uninsured/underinsured motorists by contracting for supplemental coverage." *Id.* at 14.

---

1. Subsection 3902(b)(3) states:

    (3) The insurer shall not be obligated to make any payment under this coverage until after the limits of liability under all bodily injury bonds and insurance policies available to the insured at the time of the accident have been exhausted by payment of settlement or judgments.

2. It has been suggested that the same result could have been reached in *Hurst* by merely concluding that, as a matter of contract interpretation, a recovery under the employer's uninsured coverage did not count as a payment by a "liable party" under the policy terms. *See* Eliot Alazraki, *The Death of Kenner,* 17 Advocate No. 3, p. 23, 26–27 (Summer 1995).

3. Obviously, the word "fully" must be read in a context of some limits because even stacked insurance coverage has an overall limit.

Thus, under *Hurst*, 18 *Del.C.* § 3902(b) provides for supplemental coverage founded upon a legislative intent to compensate "fully" innocent drivers.

In this case, Gillaspie argues that, based on the sweeping policy language of *Hurst*, he is entitled to UM coverage benefits under the Allstate policy. According to Gillaspie, amounts paid by the tortfeasor should be offset against his total damages and not against the amount of the UM coverage in effect under the Allstate policy. Although, given *Hurst*, there is comparable merit in this argument, 18 *Del.C.* § 3902(b)(2), by its express terms, defines an underinsured vehicle as one which has bodily injury liability coverage in effect, but the limits of such coverage are "less than" the limits provided by UM coverage.

Gillaspie points to *Nationwide Gen. Ins. Co. v. Thomas*, Del.Super., C.A. No. 93C–12–199, 1995 WL 158599, Cooch, J. (Feb. 27, 1995) (Mem.Op. at 26). In *Thomas*, the Court emphasized the policies advanced in *Hurst* and the Supreme Court's statement of purpose that an insured contracts for supplemental coverage by procuring UM coverage. In *Thomas*, two people were injured in an automobile accident and multiple claims were filed which depleted or potentially depleted the amount of the tortfeasor's available liability insurance coverage. *Thomas, supra* at 3–4. The tortfeasor maintained bodily injury liability limits of $300,000 which equaled the insured's UM coverage.

Relying on *Georgeopoulos v. State Farm Mut. Auto. Ins. Co.*, Del.Super., C.A. No. 88C–AP–34, 1990 WL 91085, Steele, J. (June 19, 1990) (Order), the Court said that under "the injured third party rule," a UM carrier cannot reduce its liability because of damages paid to injured third parties by a tortfeasor when those injured third parties are not covered under the insured's UM policy. Thus, the *Thomas* Court held that the tortfeasor was an underinsured motorist pursuant to 18 *Del.C.* § 3902(b) because the UM coverage exceeded the liability coverage actually available.

According to the Court, that interpretation of § 3902(b) was based under *Georgeopoulos* upon accepted principles of statutory construction. *Thomas, supra* at 24 (citing *Murphy v. Bd. of Pension Trustees*, Del.Supr., 442 A.2d 950, 951 (1982); *Nationwide Mut. Ins. Co. v. Krongold*, Del.Supr., 318 A.2d 606, 609 (1974)). In *Murphy*, the Supreme Court held that a court is obligated, under settled rules of construction, to read a statute as a whole and to harmonize the parts by finding the legislative intention and giving effect to it. *Id.* at 25 (citing *Murphy*, 442 A.2d at 951). In *Krongold*, the Supreme Court said that if a literal interpretation of a statute leaves a result inconsistent with the general statutory intention, such interpretation must yield to the general intent. *Krongold*, 318 A.2d at 609. This is particularly true where such a literal interpretation would lead to unjust and mischievous consequences. *Id.*

It is important to note that § 3902(b)(3) expressly speaks to liability policies which are "available" to an insured whereas § 3902(b)(2) speaks to liability policies which are "applicable." Thus, "[w]hen § 3902(b)(2) is read *in pari materia* with section (b)(3) and both sections are read in the context of the statute as a whole, it becomes apparent that the legislature generally anticipated the problem presented" by the depletion of a tortfeasor's liability coverage by third parties. *Georgeopoulos, supra*, at 9–10, *cited with approval in Thomas, passim.* Accordingly, the holdings of *Georgeopoulos* and *Thomas* harmonize subsections 3902(b)(2) and (3) by requiring that liability insurance actually be "available" rather than merely "applicable" for the purpose of defining an underinsured motorist pursuant to § 3902(b)(2).

This case, however, is distinguishable from *Thomas* and *Georgeopoulos* because there are no injured third parties and therefore no multiple claims on the tortfeasor's liability coverage. Gillaspie, however, relies on dicta wherein the *Thomas* Court said that "following the new rule announced in *Hurst*, it appears that an injured party can now potentially recover the full amount of that party's UM coverage when: (1) the injured party has sustained total damages in excess of the tortfeasor's then available liability insurance coverage; and (2) the injured party purchased UM protection in any amount."

*Thomas* at 11–12 (emphasis added). Gillaspie urges that this Court through judicial interpretation should on these facts follow the "appearance" noted in *Thomas*. Recovery from the UM carrier under this view would only be limited by the lower of the insured's actual damages or the UM policy limits. *Id.* at 12 n. 5. But the *Thomas* Court, of course, did not face directly the "underinsured vehicle" definitional situation present in the case at bar.[4]

It is one thing to interpret the automobile insurance statute to require "the limits of bodily injury liability coverage" to be actually available and not just nominally listed in the policy as the Courts did in *Georgeopoulos* and *Thomas*. It is quite a different proposition to take the threshold definition of "underinsured motor vehicle" in § 3902(b)(2) and blatantly rewrite the definition. We, mere Judges, must remind ourselves that this whole area of required automobile insurance is a creation of the legislature. Moreover, as desirable as liberal coverage is, all coverage comes at a price and it is false judicial analysis to assume that judicial liberal expansion of coverage is necessarily the best public policy. But, regardless of what is the best public policy, it is the legislature and not the judiciary that should make the determination. It would certainly be judicial arrogance in this instance to ignore a statutory definition that, insofar as this case is concerned, could not have been more clearly expressed by our General Assembly.

I suppose all Judges who sit for any period of time on some occasion are forced by reason and conscience to opine the legislature could not have meant what it said. In *Krongold,* the express statutory provisions themselves were internally inconsistent and the Court harmonized the provisions by an obvious and legitimate interpretation securing the clearly intended legislative will.[5] I, on at least one occasion, wrote extensively to ascertain legislative intent and found an ambiguity in a statutory definition, a definition that others found clear. *See Stiftel v. Malarkey,* Del.Supr., 384 A.2d 9, 18–29 (1977) (Quillen dissenting). The problem is not easy, and context can make all the difference.

Gillaspie here builds on *Hurst* and *Thomas* and would have this Court now opine, under the guise of statutory construction, that there can be "[a]n underinsured motor vehicle" even if "the limits of bodily injury liability coverage ... [do not] total less than the limits provided by the uninsured motorist coverage." It seems to me the addition of the words "do not" to the statutory language constitutes a significant change which is hard to square with legislative intent.

In *Home Ins. Co. v. Maldonado,* Del.Supr., 515 A.2d 690, 693–96 (1986), the Court discussed the enactment of and subsequent legislative amendments to the uninsured motorist statute, 18 *Del.C.* § 3902. The Court said the addition of § 3902(b) in 1982 was intended to broaden the protective benefits of the statute "to treat an underinsured tortfeasor's vehicle as an uninsured vehicle." *Id.* at 696. The Court said that its duty in construing § 3902 was to find the legislative intention and give effect to it. *Id.* at 696. The Court, however, went on to say: "Though perhaps inartfully stated, underinsured coverage thereby became, by operation of law, simply a form of uninsured coverage **when the tortfeasor's coverage is less than the injured claimant's liability insurance limits.**" *Id.* at 696 (emphasis added). Thus, even when construing § 3902 in order to give effect to the general statutory intention, the Supreme Court said that a claimant's liability insurance limits were required to be "less than" a tortfeasor's coverage.

While the public policies underlying 18 *Del.C.* § 3902 evolved upon the reexamination in *Hurst,* it is not clear to this Court that they evolved to an extent such that the clear language of § 3902(b)(2) may now simply be

---

**4.** Indeed, the exercise in *Thomas* avoided the situation at bar by concluding the tortfeasor's liability coverage available to Thomas was "less than" Thomas' UM coverage.

**5.** The cases cited in *Krongold* where a departure from the literal interpretation of a statute was made, *Magill v. North American Refractories*

*Company,* Del.Supr., 128 A.2d 233 (1956) and *Knox v. Georgia–Pacific Plywood Company,* Del. Supr., 130 A.2d 347 (1957), both involved clear situations where it was necessary to add to limited legislative language to effect general legislative intent.

ignored.[6] Gillaspie has received the $15,000 policy limits from a tortfeasor who maintained liability coverage in compliance with Delaware's statutory financial responsibility requirements. *See* 21 *Del.C.* §§ 101(27) and 2902(b). In that sense, the situation here does not result in "unjust and mischievous consequences." *See Krongold,* 318 A.2d at 609.[7] Gillaspie received precisely what the General Assembly intended.

While acknowledging the comparable merit of Gillaspie's argument in light of *Hurst,* the meaning of 18 *Del.C.* § 3902(b)(2) is so plainly clear on its face that this Court will not exercise interpretive wizardry to achieve a result, albeit a result which may be arguably more socially beneficial because it appears Gillaspie will not receive full compensation for his injuries. That consequence is a potential incident of all insurance limits and does not justify ignoring what the legislature has expressly stated in the statute. Therefore, Allstate's Motion for Summary Judgment is GRANTED. Accordingly, Gillaspie's Motion for Summary Judgment is DENIED. IT IS SO ORDERED.

---

**6.** Obviously, it can be argued that *Hurst* produces a more favorable result for the insured once the threshold definition of "uninsured vehicle" is established. But it is not the job of the Court to correct every perceived statutory inequity. The good thing about judicial "legislative intent" determinations is that they are amendable by the General Assembly itself. If the policy determination made in *Hurst* is deemed inconsistent with the legislative definition of underinsured motor vehicle, the General Assembly has the power to deal with the situation if and as it so desires.

**7.** If anything, the traditional language used by courts is even stronger against an interpretative departure from the literal legislative expression. Chief Justice Layton wrote extensively on matters

of statutory construction. His language on this point in one case reads in part as follows:

> There are cases where the strict letter of the statute is not deemed controlling. These cases are few and exceptional, and only arise where there are cogent reasons for believing that the letter does not fully and accurately disclose the intent. * * * Unjust, absurd and mischievous consequences flowing from a literal interpretation of language may create an ambiguity calling for construction. * * *

*Nigro v. Flinn,* Del.Super., 192 A. 685 (1937). Certainly there is nothing "absurd" about the statutory definition of "underinsured vehicle." Courts would do well to remember Chief Justice Southerland's admonition of caution in departing from the literal reading of legislative language. *Magill,* 128 A.2d at 236.