**NATIONWIDE MUTUAL INSURANCE COMPANY, Plaintiff,**

v.

**Donald A. FLAGG; Debra J. Puglisi, individually and as Executrix of the Estate of Anthony J. Puglisi, Jr., Melissa Puglisi and Michael Puglisi, Defendants.**

**Civ.A. No. 99C–08–247–JOH.**

Superior Court of Delaware, New Castle County.

Submitted: Jan. 8, 2001.

Decided: July 3, 2001.

Robert J. Leoni, of Morgan, Shelsby & Leoni, Newark, for plaintiff.

Bruce L. Hudson, of Wilmington, for defendants.

**OPINION**

HERLIHY, Judge.

Nationwide Mutual Insurance Company asks this Court to declare that it does not have to provide coverage to Donald A. Flagg and has moved for summary judgment on its action. Flagg was convicted of the intentional murder of Anthony J. Puglisi, Jr., and of six counts raping Debra J. Puglisi, his wife. She and her children have filed a separate action for damages against Flagg.

Each of the crimes for which Flagg was convicted required that he commit an intentional act. Nationwide had issued Flagg a homeowner's policy, but it contained a coverage exclusion for intentional acts. Since that issue was already tried and determined against Flagg, Nationwide asserts the Puglisis are collaterally estopped from relitigating it in their civil action. They, in turn, point to evidence in the criminal trial that Flagg suffered from a mental illness and was abusing drugs and alcohol during the period of time the crimes occurred. If so, intentional conduct could be negated and the exclusion would not apply.

Only the mental illness claim is a recognized defense to criminal conduct. In finding Flagg guilty, the jury affirmatively rejected that defense. While there was evidence of drug and alcohol abuse, it is statutorily disallowed as a defense to criminal conduct. Such abuse potentially negates the ability to commit intentional conduct of the kind the policy excludes from coverage.

The Court holds that the Puglisis are estopped from relitigating Flagg's mental status due to any mental illness. They are not estopped, however, from litigating his ability to engage in intentional acts because of alcohol and/or drug consumption. As to these motions, Nationwide's sum-

mary judgment motion is **GRANTED**, in part, and **DENIED**, in part.

The Puglisis also seek coverage under Flagg's and/or their automobile insurance policies, all of which Nationwide issued. The record for the basis of that claim, however, is unclear and cannot be resolved at this juncture.

### FACTS

On April 20, 1998, Flagg, armed with a gun, drove his vehicle through Mrs. Puglisi's suburban Newark neighborhood intending to kidnap someone. He spotted Mrs. Puglisi in her garden and decided to kidnap her. Flagg parked his vehicle one street over from the Puglisi home and, unnoticed, entered into her home through an unopened back door and waited inside for her.

Mr. Puglisi arrived home from work and entered the residence before Mrs. Puglisi. As he walked into the dining room area, Flagg, surprised, quickly stuck his gun in Mr. Puglisi's face and shot him at a very close range. Mr. Puglisi died as a result of being shot. Flagg then hid Mr. Puglisi in the master bedroom of the house and continued to wait for Mrs. Puglisi.

Mrs. Puglisi entered her house and, immediately, Flagg struck her in the head with his fist. She fell onto the kitchen floor and Flagg tied her up, moved her to the basement and raped her. He then moved her back upstairs, wrapped her in a comforter and tied it. Afterwards, he retrieved his car, placed her in the trunk and transported her to his residence. He raped her again, then left the house and drove back to the Puglisi residence. When he returned to his residence, he said to her, "My God, there are cops all around your house."

He then moved Mrs. Puglisi to the floor of the master bedroom, where she would spend her first night in captivity. She could hear him inhaling and exhaling. Shortly afterwards, Flagg fired his revolver twice. He later told her that he was consuming crack cocaine. The next day, Flagg was very upset and told her, "I have to stop doing these drugs."

She was held captive for five days. During that time, she was repeatedly raped, forced to sleep next to her husband's killer and usually hogtied. Flagg provided her with something that looked like Advil at one pint to relieve the pain of the ropes used to hogtie her. He also supplied Neosporin and hydrogen peroxide for her open wounds caused by the ropes, but this was only when he was not on crack cocaine. Mrs. Puglisi noticed when he was not doing the drugs that he was not as "frantic." On April 25th, the fifth day of her captivity, when Flagg was out of the house, in an act of super heroic proportions, she freed herself and phoned the police who came to his house and rescued her. Flagg was later arrested at work.

Flagg was subsequently indicted and went to trial for two counts of murder in the first degree (intentional murder and felony murder), six counts of unlawful sexual intercourse first degree, one count of unlawful sexual penetration in the first degree, one count of kidnaping in the first degree, one count of burglary in the second degree, five counts of possession of a firearm during the commission of a felony, one count of assault in the second degree and one count of possession of a deadly weapon.

During the trial, Flagg raised the defense of not guilty by reason of mental illness.[1] This is an affirmative defense

---

1. 11 *Del.C.* § 401(a):

In any prosecution for an offense, it is an affirmative defense that, at the time of the

which a defendant must prove by a preponderance of the evidence.[2] Dr. Carol Tavani testified on his behalf. She had consulted with him several times after the incident and opined that Flagg suffered from paranoid schizophrenia, cocaine and alcohol abuse, personality disorder with schizoid and antisocial features, and major depression which substantially affected his thinking, feelings and behavior during the period of time that the crimes were committed. Dr. Tavani opined that Flagg lacked the substantial capacity to appreciate the wrongfulness of his conduct. In presenting her opinion, she stated Flagg understood that what he was doing was illegal, but did not understand that his actions were morally wrong. Essentially, he knew that he could get into trouble with the police, but did not understand the physical and emotional harm he was causing to other people.

On cross-examination by the State, Dr. Tavani was asked if Flagg understood right from wrong when he had apologized to Mrs. Puglisi. She responded that he had a "glimmer" of that understanding, but he did not appreciate the injury, impact and horror of it all. She conceded, though, that he showed an awareness of the wrongfulness of his conduct when Flagg stated he could not let Mrs. Puglisi go because she would ruin his life.

Drs. Antoino Sacre and Robert Sadoff testified on behalf of the State. Dr. Sacre had almost no recollection of a July 5, 1994 mental status examination of Flagg, so he relied primarily on his notes, which stated that Flagg was cooperative and friendly, but his emotional insight was not what it should be. Dr. Sacre's notes also stated that Flagg was not experiencing either delusions or hallucinations. He could offer no opinion concerning Flagg's mental state during the time of the incident.

Dr. Sadoff examined Flagg two times with the first being on December 2, 1998, well after the crimes were committed. He testified at trial that Flagg suffered from schizotypal and personality disorder with schizoid and antisocial features in addition to a history of cocaine abuse and addiction. He concluded that Flagg knew exactly what he was doing and that it was wrong. Dr. Sadoff explained that Flagg exhibited purposeful, planned conduct, which included that he was able to form the specific intent to carry out the acts. He also stated he changed his diagnosis from schizophreniform to schizotypal, explaining that the change was made after reviewing materials that were unavailable to him at the time he made his initial diagnosis.[3]

The jury found Flagg guilty as charged on all of the offenses which he had been indicted and tried. As to each offense, it rejected his defense of not guilty by reason of mental illness.

On June 15, 1999, Mrs. Puglisi, the Estate of Mr. Puglisi, Melissa Puglisi and Michael Puglisi filed a civil action for damages against Flagg.[4] Their complaint was amended for a second time on July 30, 1999 to allege that the Puglisis suffered mental anguish and other damages as a

conduct charged, as a result of mental illness or mental defect, the accused lacked substantial capacity to appreciate the wrongfulness of the accused's conduct. If the defendant prevails in establishing the affirmative defense provided in this subsection, the trier of fact shall return a verdict of "not guilty by reason of insanity."

**2.** 11 *Del.C.* § 304(a).

3. A thorough account of the facts is recited in the Findings After Penalty Hearing, *State v. Flagg*, Del.Super., ID No. 9804019233, 1999 WL 743458, Barron, J. (June 11, 1999).

4. *See Puglisi v. Flagg*, Del.Super., C.A.No. 99C–06–145.

result of the wrongful death of Mr. Puglisi when he was shot and killed by Flagg. They asserted that Flagg engaged in negligent, reckless and wanton conduct in the death of Mr. Puglisi and sought to recover under Flagg's homeowner's insurance policy issued by Nationwide. Mrs. Puglisi alleged that she suffered scarring and nerve damage to her wrists and ankles, emotional distress, extreme mental anguish, severe physical pain and suffering, substantial medical expenses, and loss of well-being as a result of Flagg's kidnaping and raping her.

In addition to providing homeowner's insurance to Flagg, Nationwide provided automobile coverage to the vehicle he used in the commission of the crimes and to both vehicles that Mr. and Mrs. Puglisi owned. Their insurance contracts contained underinsurance motorists' [UIM] and uninsured [UM] coverage. The UIM provision allowed recovery for "bodily injury suffered by you or a relative [as a] result from an accident arising out of the ownership, maintenance, or use"[5] of an uninsured motor vehicle. An uninsured motor vehicle is "one for which the insuring company denies coverage or becomes insolvent."[6] Nationwide has denied coverage under the Flagg automobile policy, so Mrs. Puglisi seeks to recover uninsured benefits under both of the Puglisi policies.

### PARTIES' CLAIMS

Nationwide, through this declaratory judgment action, argues it has no duty to defend or indemnify Flagg under the homeowner's insurance policy because his acts were intentional and the policy excludes liability for intentional and willful acts. It asserts collateral estoppel applies to bar relitigation of whether or not Flagg's actions were intentional, since it was previously decided during the criminal trial when the jury found him guilty of intentional crimes. Additionally, Nationwide contends Mrs. Puglisi only has one claim under her uninsured motorists' policy and that claim is fruitless because Delaware law does not consider a vehicle underinsured when the tortfeasor's liability limits are equal to or exceed the UIM limits of person seeking UIM benefits.

The Puglisis assert that the uninsured benefits are available and there is no underinsurance upon which the Court can rule. In this situation, Nationwide has denied coverage under Flagg's automobile policy. Additionally, the Puglisis argue that collateral estoppel does not deny the right to relitigate the issue of whether or not Flagg's actions were intentional because (1) there is a difference in standards in criminal and civil actions for determining "intent," and (2) voluntary intoxication is not a defense in criminal cases but may negate intent in civil actions. Also, they contend that Flagg did not intentionally commit all of the alleged injuries, so those injuries unintentionally caused should be recoverable under the homeowner's policy.

### APPLICABLE STANDARD

In order for Nationwide to be entitled to summary judgment, it has the burden of showing there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[7] The Court must view the evidence in the light most favorable to the non-moving party, the Puglisis.[8] If it appears that there is any

---

5. UIM Coverage Agreement at U1.

6. *Id.* at U2.

7. *Lynch v. Athey Products Corp.,* Del.Super., 505 A.2d 42 (1985).

8. *Merrill v. Crothall–American, Inc.,* Del.Supr. 606 A.2d 96 (1992).

reasonable hypothesis by which the non-moving party might recover, the motion for summary judgment will be denied.[9]

## DISCUSSION

### A

The Puglisis filed a claim against Flagg's homeowner's insurance policy asserting that he engaged in negligent, reckless and wanton conduct in the death of Mr. Puglisi. The insurance policy contained a provision excluding liability coverage for wilful and intentional acts. The policy stated:

> Coverage E—Personal Liability, and Coverage F—Medical Payments to Others do not apply to bodily injury or property damage:
> a. which is expected or intended by the insured.[10]

Section "a" was later deleted and replaced with the following:

> a. caused intentionally by or at the direction of an insured, including wilful acts the result of which the insured knows or ought to know will follow from the insured's conduct.[11]

A similar intentional conduct exclusion provision was held valid and enforceable in *Farmer in the Dell Enterprises v. Farmers Mut. Ins. Co.*[12] There, two minors intentionally set a fire that spread to a nearby restaurant and destroyed it.[13] The minor's parents maintained a homeowner's insurance policy that excluded coverage for intentional acts; "which [are] expected or intended by the insured."[14] The Court held that the exclusion would apply if there was a showing of an intentional act coupled with an intent to cause injury or damage so long as it is reasonably foreseeable that the damage would result.[15] The Court determined that, while the fire was started intentionally not to burn the restaurant, it was a foreseeable consequence that the restaurant would also catch fire; therefore, the exclusion was triggered. Subsequent decisions have also held that intentional conduct exclusion provisions contained in insurance policies are valid and enforceable.[16]

Premised on the validity of such an exclusion, Nationwide contends its exclusion is triggered here since Flagg was convicted of numerous crimes requiring intentional conduct. He was convicted of the first degree murder of Mr. Puglisi, the elements of which require an intentional killing.[17] He was convicted of six counts of unlawful sexual intercourse in the first degree involving Mrs. Puglisi.[18] Flagg was

**9.** *Vanaman v. Milford Memorial Hospital, Inc.*, Del.Supr., 272 A.2d 718, 720 (1970).

**10.** Nationwide Insurance Policy (April 15, 1998) at 13.

**11.** Amendatory Endorsement at 4.

**12.** Del.Supr., 514 A.2d 1097 (1986).

**13.** *Id.* at 1098.

**14.** *Id.* at 1099.

**15.** *Id.*

**16.** *Capano Management Co. v. Transcontinental Ins. Co.*, D.Del., 78 F.Supp.2d 320 (1999); *Nationwide Mut. Fire Ins. Co. v. Smith*, Del.Super., C.A. No. 95C–11–111, 1998 WL 433941, Quillen, J. (April 2, 1998); *Camac v. Hall*, Del.Super., 698 A.2d 394 (1996); *E.I. Du Pont de Nemours & Co. v. Admiral Ins. Co.*, Del.Super., C.A. No. 89C–AU–99, Steele, V.C. (February 22, 1996).

**17.** 11 *Del.C.* § 636(a)(1):

> The person intentionally causes the death of another person.

**18.** Formerly 11 *Del.C.* § 775(a):

> A person is guilty of unlawful sexual intercourse in the first degree when the person intentionally engages in sexual intercourse with another person and any of the following circumstances exist: ....

also convicted of other crimes such as burglary in the second degree, kidnaping in the first degree, unlawful sexual penetration in the first degree, unlawful sexual penetration in the second degree and various weapons offenses. All these crimes require intentional conduct.

The conviction in all these charges necessarily meant he had not proven he was not guilty by reason of mental illness. Despite that, the Puglisis assert they should be allowed in their civil action to show Flagg could not have committed all these intentional acts, since he was mentally ill. Being mentally ill, they argue, he was unable to have the requisite mental state to commit an intentional act. There would be no exclusion triggered, therefore. Nationwide counters by referring to the jury's verdicts in the criminal trial and argues the Puglisis are collaterally estopped from relitigating Flagg's mental status due to any mental illness.

■ Collateral estoppel prevents a party from relitigating a factual issue previously litigated and decided.[19] The requisites of the doctrine are: (1) the original court must have had jurisdiction of the subject matter of the suit and the parties to it; (2) the parties to the original action were the same as the parties, or their privies, here; (3) the cause of action in the original action was the same in the case at bar, or the issues necessarily decided in the prior action were the same as those raised in the case at bar; and (5) the decree rendered the prior action is final.[20]

The Puglisis offer two arguments in an effort to show collateral estoppel is inapplicable. One is that there are different standards of proof between civil and criminal matters. Based on that argument, they claim the proof of an intentional act in a criminal trial does not preclude being able to prove in a civil trial that the acts were not intentional and, thus, prevent triggering the exclusion. Their argument appears to address the third element of collateral estoppel, namely, the identity of issues.

■ This argument contravenes the policy behind the doctrine of collateral estoppel. That doctrine is designed to provide a definite end to litigation and preserve judicial resources.[21]

Through Flagg, the Puglisis seek to have Nationwide compensate them. They have taken an assignment of his rights, too. They want to show his conduct was not intentional. Without doubt, they are in privity with Flagg.[22] Nor do they dispute that they are. In *Brower*, a shooting victim sought damages in a civil action. Brower had been the defendant in a criminal trial and was convicted of assault with intent to kill the person seeking damages. Brower had, as Flagg, a homeowner's policy and, as here, it excluded coverage for intentional conduct. The victim claimed Brower, more particularly his insurer, was liable since the shooting was accidental. In the declaratory judgment action brought by Brower's insurer, the court held the victim was collaterally estopped from relitigating the issue of intent. The insurer did not have to provide coverage.[23]

19. *State v. Machin,* Del.Super., 642 A.2d 1235, 1238 (1993).

20. *Columbia Casualty Co. v. Playtex FP, Inc.,* Del.Supr., 584 A.2d 1214, 1216–18 (1991).

21. *State v. Warren,* Del.Super., Cr.A.No. IS–96–11–0201, 1997 WL 366897, Graves, J. (March 11, 1997).

22. *New Jersey Manufactures Ins. Co. v. Brower,* App.Div., 161 N.J.Super. 293, 391 A.2d 923, 926 (1978).

23. *Id.* at 927. Accord, *Casey v. Northwestern Security Ins. Co.,* 260 Or. 485, 491 P.2d 208 (1971); *Aetna Life and Casualty Ins Co. v. Johnson,* Mont.Supr., 207 Mont. 409, 673

Years ago, in a case upholding the use of collateral estoppel in a civil action where the issue had been decided in a criminal action, California Justice Traynor explained:

> To preclude a civil litigant from relitigating an issue previously found against him in a criminal prosecution is less severe than to preclude him from relitigating such an issue in successive civil trials, for there are rigorous safeguards against unjust conviction, including the requirements of proof beyond a reasonable doubt and of a unanimous verdict, the right to counsel, and a record paid for by the state on appeal. Stability of judgments and expeditious trials are served and no injustice done, when criminal defendants are estopped from relitigating issues determined in conformity with these safeguards. [Citations omitted.] [24]

*Ohio Casualty Ins. Co. v. Clark* [25] illustrates the role of collateral estoppel in a way strikingly similar to this case. Clark was found guilty of manslaughter. His homeowner's policy contained an exclusion for expected or intended conduct. While the circumstances of the killing and application of the exclusion are not directly on point, what is germane is that the criminal jury rejected a self-defense claim in that trial. If the killing had been in self-defense, the exclusion may not apply. But, the court said collateral estoppel barred relitigation of the issue. The jury's manslaughter verdict vitiated that defense. [26]

■ The same reasoning applies here. Flagg's conviction of a host of crimes, all of which contain the element of intention, means the jury rejected his defense of not guilty by reason of mental illness. Further, the fact that he acted intentionally has been established. The difference in burden of proof in these proceedings is irrelevant. As a matter of fact, it is less in the civil case. Therefore, the Puglisis are collaterally estopped from relitigating Flagg's inability to commit intentional acts because of any mental illness.

### B

■ In Count III of their amended complaint, Mrs. Puglisi asserts Flagg negligently caused a series of injuries to her, which injuries are itemized. Flagg was convicted of intentionally causing physical injury to Mrs. Puglisi, but the indictment is non-specific about the injury or injuries. Under the doctrine of collateral estoppel, any of these injuries itemized in the civil action which form the basis for the negligence claim cannot be relitigated. In other words, a negligence claim will not be available to escape the exclusion for injuries a jury determined were intentionally inflicted. [27]

It is an accepted principal of tort law that where there is intentionally tortious conduct, ordinary consequences, as well as specifically intended consequences, are deemed intended. Thus, it is the unintentional, but foreseeable, scope of the intentional act which controls. [28] If Flagg's actions are deemed intentional, as a matter of law, all foreseeable injuries would be considered intentional.

---

P.2d 1277 (1984); *Safeco Ins. Co. of America v. Yon*, Ct.App., 118 Idaho 367, 796 P.2d 1040 (1990).

**24.** *Teitelbaum Furs, Inc. v. Dominion Ins. Co.*, 58 Cal.2d 601, 25 Cal.Rptr. 559, 375 P.2d 439, 441 (1962).

**25.** 1998 ND 153, 583 N.W.2d 377 (1998).

**26.** *Id.* at 382.

**27.** *Brower,* 161 N.J.Super. 293, 391 A.2d 923.

**28.** *Farmer in the Dell,* 514 A.2d at 1099.

## C

■ While the Puglisis are collaterally estopped from relitigating Flagg's mental illness and the issue of intent, the same does not apply to his possible intoxication due to drugs and/or alcohol and the issue of intent. This is the Puglisis second argument, namely, that collateral estoppel is inapplicable to this issue. One element of collateral estoppel is that the issue was raised and decided in the other proceeding, here the criminal trial. Intoxication could not have been raised or decided in that trial. Voluntary intoxication is not permitted as a defense in a criminal action.[29] Further, by law, intoxication alone does not constitute mental illness or mental defect as defined in the statute setting out not guilty by reason of mental illness.[30]

The issue of whether Flagg was intoxicated to a degree he could not form the requisite intent will have to be litigated. Nationwide will bear the burden of showing he could or did have the intent, since it has the burden of proving the exclusion applies.[31]

This holding is consistent with those of numerous jurisdiction which have permitted evidence of voluntary intoxication to be presented before a jury to determine whether it negated "intent" as outlined in a homeowner's exclusionary provision. In *Thrif–Mart, Inc., v. Commercial Union & Cas.*,[32] the homeowner's insurance policy was held to deny coverage, under the intentional exclusion provision, because the son's vandalism (starting a fire) was considered intentional. On appeal, it argued that the son was intoxicated when he started the fire, which negated the requisite intent. The court stated that the question of intent was an issue for the jury to decide and, since the jury concluded the intoxication never negated the son's mental state, the court found no grounds for reversal. In *Republic Ins. Co. v. Feidler*,[33] the court stated the jury must determine whether the insured was too intoxicated to intend injury.

Certain jurisdictions have also enforced this proposition: "The mental state of the insured may be an important factor in determining whether he intended to cause bodily injury in this context. Evidence that the defendant ... may have lacked the capacity to act with the requisite intent to cause bodily injury to the plaintiff due to alcohol or drug intoxication weighs against a determination that the policy language excludes coverage."[34] "[E]vidence of voluntary intoxication is relevant to determining the presence or absence of intent with reference to an exclusion clause."[35] "[A] voluntary intoxicated insured may lack the mental capacity to act intentionally."[36] Whether voluntary intoxication renders an insured incapable of forming an intent or expectation of injuring another is a question of fact, to be submitted to the jury.[37] "Although the insured's voluntary intoxication did not negate the intent required to support his

---

**29.** 11 *Del.C.* § 421.

**30.** 11 *Del.C.* § 422.

**31.** *State Farm v. Hackendorn*, Del.Super., 605 A.2d 3 (1991).

**32.** 154 Ga.App. 344, 268 S.E.2d 397 (1980).

**33.** Ariz.App.Ct., 178 Ariz. 528, 875 P.2d 187 (1994).

**34.** *Foley v. Nationwide Mut. Ins. Co.*, Mass.Super., C.A.No. 98–0219C, 2000 WL 1923516, Agnes, J. (Dec. 28, 2000) at n. 2.

**35.** *Hanover Ins. Co. v. Talhouni*, Mass.Supr., 413 Mass. 781, 604 N.E.2d 689, 692 (1992).

**36.** *Feidler*, 875 P.2d at 191.

**37.** *State Farm Fire & Cas. Co. v. Morgan*, 258 Ga. 276, 368 S.E.2d 509 (1988).

criminal conviction, it could have been sufficient to negate the intent encompassed by the policy."[38]

On the other hand, some jurisdictions have rejected the notion that voluntary intoxication may negate the insured's "intent" pertaining to an insurance exclusionary provision.[39] It must be noted that in most of those cases, the insured was seeking to recover funds paid to the victim(s) from the insurance company as a reimbursement, and the courts denied the issue of voluntary intoxication because they did not want the insured to benefit from his own wrongdoing. Courts that have permitted evidence of voluntary intoxication to negate intent generally have done so as a matter of public policy in order to allow as a victim to be compensated for his or her losses. In Mrs. Puglisi's situation, she should have the opportunity for as a jury to determine whether Flagg was so intoxicated from alcohol and/or crack cocaine that it negated his intent. The record in this case so warrants.

Flagg told Mrs. Puglisi at one point, "I have to stop doing these drugs," and sporadically fired as a gun twice in his own home. It should be as a question for the jury whether the consumption of alcohol and drugs negated Flagg's mental state. Dr. Travani's diagnosis also provides evidence that Flagg may not have intended to injure. It is unclear, however, whether that diagnosis stems from substance abuse or mental illness. The latter, of course, cannot be relitigated. Dr. Travani concluded that Flagg knew he could get in trouble with the police, but did not understand the physical and emotional harm he was causing the other people. She also found he suffered from alcohol and cocaine abuse.

Flagg's own actions during the kidnaping potentially displayed signs of lack of intent to injure, possibly due to substance abuse. He gave her something that looked like Advil for the pain in her wrists caused from the ropes used to hogtie her being too tight. He also gave her, and helped her apply, hydrogen peroxide and Neosporin to cure the infection on her open wounds from the rope. Mrs. Puglisi also noticed as a change in Flagg's behavior when he was consuming crack cocaine.

The doctrine of collateral estoppel does not bar relitigation of this issue since the jury in the criminal case was not permitted to consider Flagg's voluntary intoxication, which essentially creates as a new issue for as a civil jury: whether Flagg was so voluntarily intoxicated that the lacked the "intent" to cause injury. Summary judgment, therefore, cannot be granted with this genuine issue of material fact present.[40]

### D

Additionally, the complaint in Count I alleges Flagg was negligent by not obtaining assistance for his mental and drug addiction.[41] Delaware law imposes

---

**38.** *Prudential Property & Cas. Inc. Co. v. Kollar*, App.Div., 243 N.J.Super. 150, 578 A.2d 1238, 1240 (1990) *(citing Burd v. Sussex Mut. Ins. Co.*, 56 N.J. 383, 267 A.2d 7 (1970)).

**39.** *See Group Ins. Co. v. Czopek*, 440 Mich. 590, 489 N.W.2d 444 (1992); *Wessinger v. Fire Ins. Exchange*, Tex.App.Ct., 949 S.W.2d 834 (1997); *K.B. v. State Farm Fire and Cas. Co.*, Ariz.App.Ct., 189 Ariz. 263, 941 P.2d 1288 (1997); Grange *Mutual Cas. Co. v. J.D. Gore*, Ohio App.Ct., C.A.No. 96–08–076, 1997 WL 249949, Powell, J. (May 12, 1997); *Prasad v. Allstate Ins. Co.*, Fla.Supr., 644 So.2d 992 (1994); *Prudential Property & Cas. Inc. Co. v. Kerwin*, 215 Ill.App.3d 1086, 159 Ill. Dec. 425, 576 N.E.2d 94 (1991).

**40.** *Pullman v. Phoenix Steel Corp.*, Del.Super., 304 as A.2d 334, 335 (1973).

**41.** The Puglisis' argument rests on *Swift v. Fitchburg Mut. Ins. Co.*, 45 Mass.App.Ct. 617,

the duty to defend "even when only one count or theory of the plaintiff's complaint lies within coverage of the policy." [42] In *St. Anthony's Club v. Scottsdale Ins. Co.*,[43] this Court stated, "[n]egligent conduct ... is as a covered risk." [44] Therefore, Nationwide has as a duty to defend on all claims, but it may seek reimbursement from Flagg of those expenses, costs or fees incurred by providing his defense on those claims which may be proven later to fall outside the policy coverage.[45] At this point, however, the record is incomplete on this issue. Further factual and legal exploration is needed.[46]

### E

The Puglisis also seek coverage from Flagg's automobile insurance policy. It and the policies on Mr. and Mrs. Puglisi's vehicles were issued by Nationwide. It is unclear, however, on the record presented and arguments to date, whether the Puglisis seek UIM coverage or UM coverage. Nationwide has denied liability for coverage from Flagg's policy but on the basis that UIM coverage cannot exist in this matter.

The starting point in the unraveling of this confusion is with the two Puglisi policies. Under Delaware law, when there are two or more vehicles owned by persons living in the same household and insured by the same carrier, the separate liability limits on each shall not exceed the highest limit applicable to any insured vehicle.[47] That being the case, the record here shows Flagg's liability limits of $100,000 equal the UIM liability limits of the highest insured Puglisi vehicle. When that is the case, the tortfeasor, here Flagg, is not considered underinsured.[48] This would normally result in Mrs. Puglisi being unable to recover UIM benefits from the applicable policy in her household.[49]

■ But, Nationwide has disclaimed coverage through the Flagg policy. Her policy, however, defines an uninsured vehicle as "one for which the insuring company

700 N.E.2d 288 (1998). In *Swift*, the defendant attacked and injured two women with as a knife and as a shovel. The defendant's homeowner's insurance company refused to represent him in the civil action and denied coverage based on an intentional exclusion provision of the policy. The judge determined that the defendant had as a history of psychological problems which required medication, the defendant failed to take his medication which was as a proximate cause of why the defendant lost control and attached the victims and the failure to take the medication amounted to negligence. The victims received monetary damages. Subsequently, the victims sued the homeowner's insurance company for breach of the duty to indemnify and defend. The court held that the insurer had as a duty to indemnify and defend an action based on negligence.

**42.** *Continental Cas. Co. v. Alexis I duPont School District*, Del.Supr., 317 A.2d 101, 105 (1974); *see also National Union Fire Ins. Co. of Pittsburg, Pa. v. Rhone–Poulenc Basic Chemicals Co.*, Del.Super., C.A. No. 87C–SE–11, 1992 WL 22690, Poppiti, J. (January 16, 1992).

**43.** Del.Super., C.A. No. 97C–07–112, 1998 WL 732947, Herlihy, J. (July 15, 1998).

**44.** *Id.* at 5.

**45.** *See First Delaware Ins. Co. v. Tilcon Delaware, Inc.*, Del.Super., C.A. No. 97C–06–004, 1998 WL 278311, Herlihy, J. (March 31, 1998).

**46.** *Wilson v. Triangle Oil Co.*, Del.Super., 566 A.2d 1016, 1018 (1989).

**47.** 18 *Del.C.* § 3902(c).

**48.** 18 *Del.C.* § 3902(b)(2); *Nationwide Must. Ins. Co. v. Williams*, Del.Supr., 695 A.2d 1124 (1997).

**49.** *Allstate Ins. Co. v. Gillaspie*, Del.Super., 668 A.2d 757 (1995); *aff'd* Del.Supr., 676 A.2d 903 (1996).

598

denies coverage." [50] It is unclear whether Nationwide's denial of coverage on the Flagg policy operates to make his vehicle uninsured, thereby triggering Mrs. Puglisi's UM coverage.

The record on this issue is incomplete. It is one which prevents the award of summary judgment pending further development of the facts and law.[51]

*CONCLUSION*

For the reasons stated herein, Nationwide Mutual Insurance Company's motion for summary judgment is **GRANTED**, in part, and **DENIED**, in part.

---

**50.** Puglisis Nationwide Automobile Insurance Policies at U2.

**51.** *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467, 470 (1962).